William A. CARTER, Jr., Appellant,

v.

UNITED STATES of America,
Appellee.

No. 22187.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1969.

Decided April 30, 1970.

---

Mr. J. Patrick Hickey, Washington, D. C. (appointed by this court), for appellant.

Mr. John Ellsworth Stein, Asst. U. S. Atty., for appellee. Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, Victor W. Caputy, Asst. U. S. Atty., and Robert P. Watkins, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee. Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Daniel E. Toomey, Asst. U. S. Attys., also entered appearances for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge, and McGOWAN and ROBB, Circuit Judges.

ROBB, Circuit Judge:

After a trial by jury in the District Court the appellant was convicted of rape (22 D.C.Code § 2801), assault with a dangerous weapon (22 D.C.Code § 502), and carrying a dangerous weapon (22 D.C.Code § 3204). He was sentenced to serve not less than seven nor more than twenty-one years for rape, from forty months to ten years for assault, and one year for carrying a dangerous weapon, all sentences to run concurrently. On this appeal he contends that the district judge erred in refusing to give a requested instruction as to the necessity for corroboration of the testimony of the complainant, identifying the appellant as her assailant. He argues that the error was compounded when the court failed to give adequate guidance to the jury on the subject of corroboration. He submits further that the court erred in not sending to the jury room, on request of the jury, a statement signed by the complaining witness which had been marked for identification and used by defense counsel on cross-examination, but which was never offered or received in evidence. We affirm.

At the time of the rape charged in the indictment the complainant was employed as a nursing assistant at St. Elizabeths Hospital. She testified that about half past eleven on the night of April 26, 1967, she alighted from a bus, en-

tered the extensive hospital grounds though Gate 4, and walked along her usual path towards the Dix Building where she was to go on duty. It was raining and she was carrying an umbrella.

The complainants route took her by the head of a stairway leading down to the entrance into a tunnel or underpass. When she got to this point a man came up the stairs with a gun in his hand and told her not to scream. Thinking the man wanted money she tried to hand him her pocketbook but "he didn't take my pocketbook or anything, and he asked, he started asking me whether or not I knew him or had I seen his face or—and I told him no, and he told me to come this way". She complied with the gunman's demands and he walked her down the stairs, passing under a light at the entrance into the tunnel. Threatening her continually with his gun he then took her to a parking lot in another part of the grounds. On the way, as they were crossing the street, an automobile with its headlights on almost hit them. The car "pulled almost to a stop", and at this time the man ran ahead and then "drifted back" and took the complainant by her arm, "and it was a pause". The complainant testified that she had an opportunity to see the man's face in the light at the entrance to the underpass and again in the lights of the automobile.

When the assailant and his victim arrived at the parking lot "he said that he was going to try a few cars to see if any of them were open, and the one that he did try, it was open and we got in on the driver's side." The man made the complainant remove her underclothes, pushed her down on the seat, kissed her, and then forced her to have sexual intercourse with him. There was some light in the car from the street lamps, enabling her to see the man's face, and she felt his face during the act of intercourse.

Following the rape the assailant lit a cigarette, after telling the complainant not to look at him. He then al-lowed her to light a cigarette and talked to her for "maybe about five minutes, ten minutes", saying that she "would probably have him hung for this but it didn't make any difference because he was going to Viet Nam soon and it just didn't make any difference." She testified that "after I put on my clothes and he put his cigarette out, we got out of the car and we crossed the street and he walked me to Blackburn Laboratory and he told me not to look back and he wasn't walking, holding my arm, at this time I was walking in front of him". Somewhere between the Blackburn Building and the Dix Building the rapist disappeared.

When she got to the Dix Building the complainant immediately reported the rape to her supervisor, who called in the Assistant Director of Nursing. The Assistant Director testified that the complainant was sobbing, hysterical, "blanched" and "tremulous". She kept repeating "he had a gun", "I don't want my mother to know about this" and "I feel so dirty". After about an hour she was able to give the details of what had happened and she said she thought she would be able to identify the man who had attacked her.

The police were called, and together with the complainant and members of the hospital staff, they retraced the path that the complainant had taken with her attacker. They searched the hospital grounds for the car in which the attack occurred, but it was not there. The complainant described the car as a Comet, Ambassador or Rambler with light blue exterior and interior, shiny upholstery and head rests which did not come with the car but were attached to the front seat. She described the gun used by her attacker as a dark colored automatic, which she was able to recognize because of her experience on her school rifle team. She said the rapist had a mustache and she could feel hair on his chin. She did not recognize the man, she said, but thought he looked "vaguely familiar" and might have been a patient at the hospital.

On the day after the rape the complainant went to the office of the Sex Squad of the Metropolitan Police Department and gave a statement which was reduced to writing and signed by her. This statement, which at trial was marked Exhibit 4–B for identification, and which defense counsel used on cross-examination of the complainant, included the sentences "I didn't see his face at all but I felt the goatee, mustache and hat. I wouldn't know him by sight if I saw him again but I am pretty sure I would know his voice". The complainant testified that she had made this statement "with reason", the reason being that she was afraid to look her attacker in the face, with "him knowing it."

A detective assigned to the Sex Squad testified that after a policewoman took the complainant's statement he interviewed the complainant "off to one side" and "she told me that she felt sure she could identify him when she saw him in person". He testified further, however, that he had written in his notes of that interview "Suspect unable to identify * * * I feel that it would be of no use to show her photographs as they don't click. * * * Lighting was bad, didn't take a good look at face, only profile".

Three or four days after the rape the complainant returned to her work as a nursing assistant in the Dix Building. This building is near the Gate 3 entrance to the hospital grounds and the complainant sometimes used that gate to enter or leave the grounds. Appellant Carter had been employed as a security guard at St. Elizabeths since January 1967 and on occasions was stationed at Gate 3. The complainant testified that after she returned to work she saw Carter on duty at Gate 3 perhaps "once or twice a week" and that she "several times" saw the automobile in which the assault was committed parked near Gate 3, and on one occasion saw Carter driving it near the hospital. After some two weeks she came to the conclusion that Carter was the man who had attacked her. She did not immediately report her conclusion to the police, but waited for two weeks more because "I felt embarrassed * * * I was afraid of being laughed at. It just seemed stupid that we both were working there and something like this would happen."

When the complainant did report her conclusion to the police they obtained a search warrant for Carter's automobile and upon executing it found a loaded .32 caliber automatic pistol in the glove compartment. On May 26, 1967, on the grounds of St. Elizabeths Hospital, the complainant identified the gun and automobile as those used in the attack, she identified William Carter as the attacker, and he was arrested. She likewise identified Carter at trial.

The evidence disclosed that the appellant's automobile was a 1966 Plymouth Fury. Its color was described by the complainant as "light blue" or "Dior blue". A police officer testified that it was "powder blue" and the appellant said it was "green". In the light of these varying descriptions the car itself was viewed by the jury. There was no dispute, however, that the headrests and upholstery in the car, and the pistol found in the glove compartment, matched the description the complainant gave to the police shortly after the assault. There was evidence also that at the time of the assault, Carter wore a mustache and had a patch of hair on his lower lip.

Testifying in his own defense the appellant swore that he had not been on the grounds of St. Elizabeths on the night of April 26. He said he had gone to work at St. Elizabeths at midnight April 25, and had worked until 8 o'clock the next morning; that April 26 was his day off; and that he had spent that entire day and evening at home with his wife. His wife and his sister-in-law testified in support of this alibi. The jury might have found that their credibility was impaired, however, when they swore that the appellant had likewise been at home during the entire night of April 25–26. This testimony was contradicted by the appellant's own testimony and by the hos-

pital records showing that he had been at work on that night.

It was not disputed at trial that the complainant had in fact been assaulted. Counsel for the appellant in her closing argument said to the jury: "I would say to you at the outset that I don't think anybody in this courtroom has any doubt that [the complainant] on April 26, had a very brutal and nasty experience, and I think anybody who saw that young woman on the witness stand has a great deal of sympathy for her". In this connection it may be noted that microscopic examination of the complainant's undergarments, which she had purchased on the day of the assault and put on for the first time less than an hour before she was raped, disclosed the presence of spermatozoa.

 As we have said the appellant argues that the district judge erred by refusing to grant his request for an instruction on the requirement of corroboration of the testimony of the complainant, identifying the appellant as her attacker. The requested instruction first stated that the jury must find corroboration for the complainant's testimony that she was forced to have sexual intercourse. The instruction then continued:

"Now, there is also a second issue upon which the law requires that the complaining witness in a rape case be corroborated. That is the issue of the identity of the man she says attacked her. In this case, [the complainant] has identified the defendant William A. Carter, Jr.

"But there must be evidence aside from her testimony that corroborates this identification. The evidence which the government has presented in addition to the complaining witness' testimony is the fact that the defendant has a car which the complainant identifies as the place of the attack and the fact that the defendant had an automatic revolver in the glove compartment of his car. You may consider these factors as sufficiently corroborative, or you may find them as insufficient to

corroborate the complaining witness' identification.

"Unless you find that the testimony of the complainant is sufficiently corroborated, and I repeat, this is a matter for your judgment, and that her testimony as corroborated establishes beyond a reasonable doubt all the essential elements of the offense, you must find the defendant Not Guilty."

The requested instruction was denied by the district judge with the notation "Denied but will cover".

The court was not bound to accept the language which counsel employed in framing the instruction. Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L. Ed. 624 (1897); Wheeler v. United States, 82 U.S.App.D.C. 363, 165 F.2d 225, cert. den., 333 U.S. 829, 68 S.Ct. 448, 92 L.Ed. 1115 (1947); Ramey v. United States, 118 U.S.App.D.C. 355, 336 F.2d 743, cert. den., 379 U.S. 840, 85 S. Ct. 79, 13 L.Ed.2d 47 (1964). Moreover the instruction, which purported to summarize the evidence corroborating the complainant's testimony as to identification, presented an incomplete, diluted and in some respects inaccurate statement of that evidence. It might well have had a tendency to mislead the jury. See Agnew v. United States, 165 U.S. 36, 51, 52, 17 S.Ct. 235, 41 L.Ed. 624 (1897). It was properly denied. The question remains, however, whether the instruction as given by the court was correct and adequately covered the subject.

 The law in this jurisdiction is that there must be corroboration of the testimony of a complaining witness in a prosecution for rape. Franklin v. United States, 117 U.S.App.D.C. 331, 330 F.2d 205 (1964); Borum v. United States, 133 U.S.App.D.C. 147, 409 F.2d 433 (1967), cert. den., 395 U.S. 916, 89 S.Ct. 1765, 23 L.Ed.2d 230 (1969); Walker v. United States, 96 U.S.App.D.C. 148, 223 F.2d 613 (1955); Allison v. United States, 133 U.S.App.D.C. 159, 409 F.2d 445 (1969); Ewing v. United States, 77 U.S. App.D.C. 14, 135 F.2d 633, cert. den., 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145

(1942); Kidwell v. United States, 38 App.D.C. 566 (1912). There must of course be corroboration with respect to the *corpus delicti*, that is the fact of a sexual assault. As a general rule corroboration is also required as to the identification of the accused by the complainant. In both instances, the corroboration need not be by "direct evidence"— the testimony of an eye witness—but it may consist of proven circumstances which tend to support the complainant's story.

With respect to the requirement of corroboration as to identity we have held that although the circumstances of the identification must be convincing, McKenzie v. United States, 75 U.S.App. D.C. 270, 126 F.2d 533 (1942), the facts of a particular case may be such that a convincing identification by the complaining witness based upon adequate opportunity to observe need not be further corroborated. Franklin v. United States, 117 U.S.App.D.C. 331, 330 F.2d 205 (1964); Calhoun v. United States, 130 U.S.App.D.C. 266, 399 F.2d 999 (1968); Thomas v. United States, 128 U.S.App. D.C. 233, 387 F.2d 191 (1967). As we said in the *Thomas* case and repeated in the *Calhoun* case the need for corroboration depends upon the danger of falsity, and the danger of an erroneous identification in a rape case is not of the same magnitude as the danger of a fabricated rape.

We think the facts and circumstances shown by the evidence were sufficient to corroborate the testimony of the complainant identifying the appellant as her attacker. Without repeating in detail what has already been said we refer to the similarity if not identity between the appellant's automobile, his gun, and certain of his facial characteristics, and the description given to the police by the complaining witness. Indeed, counsel for the appellant conceded at oral argument that there was sufficient corroboration of identity.

We turn to the question, whether the corroborating evidence was submitted to the jury under correct and adequate instructions from the court. The court told the jury that:

"To establish that the defendant has committed the crime of rape, the Government must prove three elements beyond a reasonable doubt.

"1. That someone had carnal knowledge of the complaining witness in the District of Columbia.

"2. That the act was committed forcibly and against the will of the complaining witness; and

"3. That the defendant was the person who had carnal knowledge of the complaining witness against her will."

After discussing the elements of carnal knowledge and lack of consent the court continued:

"Now, the law does not permit the establishment of the crime of rape on the basis of the testimony of the complaining witness standing alone. Corroboration of her testimony is required according to the rule of law prevailing in the District of Columbia. Such corroboration, however, need not be by eye witnesses. Eye witnesses can hardly ever be obtained in regard to such an offense as is charged in this case. Corroborating circumstances may be sufficient corroboration."

The court then briefly referred to certain matters which the jury might consider as corroborating the testimony of the complaining witness that a rape had occurred. The court then said:

"As to the third element, identification of the defendant, the law requires that you be convinced beyond a reasonable doubt that the defendant was the person who committed the act. The identification by the complaining witness may be sufficient if the circumstances convince you of its accuracy beyond a reasonable doubt.

"In considering the accuracy of such an identification, you may consider the opportunity which the complaining witness had to observe, or other factors and other evidence *which may tend to corroborate the identification.*" (Emphasis supplied.)

Later in the charge, the court added that

"I instruct you that testimony as to identity is to be scrutinized with care".

The court then directed the attention of the jury to several facts and circumstances which they might consider in determining whether or not the government had sustained its burden of proving the identity of the accused as the man who committed the crimes charged in the indictment.

It is axiomatic that a charge to the jury must be considered as a whole. Kinard v. United States, 69 App.D.C. 322, 101 F.2d 246 (1938); Carey v. United States, 111 U.S.App.D.C. 300, 296 F.2d 422 (1961). Considering the court's discussion of identification in the context of the general instruction that there must be corroboration of the testimony of the complaining witness we think the charge, although perhaps not a model, was an adequate statement of the law. In particular, we think it plain that the jury were given to understand that corroboration of the identification was required. Accordingly, we find no error in the charge.

■■ During the cross-examination of the complaining witness the following occurred:

"Q. Now * * *, do you remember shortly after this happened, in fact, on April 27th, 1967, giving a statement at the Sex Squad that you signed?

"A. Yes.

"Q. And do you remember in that statement saying I did't see his face at all but I felt the goatee, mustache and hat. I wouldn't know him by sight if I saw him again, but I'm pretty sure I would know his voice? * * *

"A. With reason, yes.

"Q. With reason?

"A. Yes.

"Q. But that was your statement at the time?

"A. With reason, yes.

"Q. You were afraid to look him right in the face, weren't you, * * *?

"A. With him knowing it."

The signed statement referred to by counsel was government Exhibit 4–B for identification, a "Jencks Act statement", (18 U.S.C. § 3500) which had been made available to the accused. The particular portion of the statement to which the cross-examiner directed the attention of the complainant, and which the complainant admitted was in her words, consisted of two sentences. Having obtained an admission that these sentences accurately reflected the complainant's words, counsel did not offer the exhibit in evidence, and it was never received in evidence.

After the jury had begun its deliberations the foreman sent a note to the court which read "Wish the description given to the police and the flyer distributed". The court discussed the note with counsel in the absence of the jury and it was agreed that the "flyer" referred to was a police department lookout form, Exhibit 4–A for identification, which had not been received in evidence. Counsel for both sides stipulated that this exhibit might go to the jury and it was sent to the jury room. It was agreed further by counsel that the "description given to police" referred to Exhibit 4–B for identification. Counsel for the government objected to the submission of this document to the jury, and in view of the fact that it had not been admitted in evidence the court sustained the objection.

Explaining the ruling with respect to Exhibit 4–B, the court said that "in addition to the fact that particular statement was not admitted in evidence, although it was used to cross examine the witness, I don't think it would be proper to put that statement in without going back and having the reporter read all the testimony" relating to the complainant's explanation and to other statements by her, in some of which she said she could identify her assailant. The court concluded that halting the jury's deliberations for the purpose of getting and reading the transcript of such testi-

mony would result in an unacceptable and unnecessary delay.

The appellant contends that the court's ruling was error. We do not agree. It is elementary that the jury may consider only matter that has been received in evidence. Sawyer v. United States, 112 U.S. App.D.C. 381, 384, 303 F.2d 392, 395, cert. den. 371 U.S. 879, 83 S.Ct. 150, 9 L. Ed.2d 116 (1962); United States v. Adams, 385 F.2d 548 (2nd Cir. 1967); Osborne v. United States, 351 F.2d 111 (8th Cir. 1965). Since Exhibit 4–B for identifcation was not in evidence, the ruling of the trial court was correct.

Although the court's ruling was sound as a matter of law, we have examined Exhibit 4–B for identification, which is in the record before us, and we find that as a practical matter its submission to the jury would have prejudiced the appellant. The exhibit contained a detailed and circumstantial account of the attack on the complainant. Except for the two sentences which were read to the complainant on cross-examination, and which were already before the jury, it was entirely consistent with and reinforced the complainant's testimony at trial. In particular, the description of the assailant, his automobile, and his pistol, given to the police on the day after the rape, matched in detail the description given by the complainant from the witness stand and the facts as disclosed by the evidence at trial.

Furthermore, the exhibit mentioned additional details which were not fully developed in the complainant's testimony, and which were damaging to the appellant. Thus the statement contained the following: "Then he said that he was going to try all the cars there until he found one open. The first car that he tried was open. This was not the first car that he came to on the lot, he went past several cars to go to this particular one. The car was a light blue, a hard top two-door, probably a Comet or Ambassador." The jury might well have inferred from this conduct of the rapist that he was not searching for an open car, but was heading for his own car, which he knew would be open.

In short, Exhibit 4–B for identification was a forceful and convincing presentation of the evidence with respect to the rape. Considering this, it is easy to understand why trial counsel went no further after eliciting from the complainant an admission that as reflected in the statement she had said she could not identify her assailant. Had counsel gone further, and offered the exhibit in evidence, we might now be asked to hold that the defense was incompetent.

The judgment is

Affirmed.