**UNITED STATES of America**
**v.**
**George A. MARTIN, Appellant.**
**No. 71-1457.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 7, 1972.

Decided Jan. 26, 1973.

Durward M. Taylor, Washington, D. C., with whom Belford V. Lawson, Jr., Washington, D. C., was on the brief (both appointed by this Court), for appellant.

Thomas H. Queen, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Warren L. Miller, Asst. U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, and McGOWAN and TAMM, Circuit Judges.

TAMM, Circuit Judge:

Appellant George A. Martin was tried before a jury and convicted of assault on

George R. Thompson with intent to kill while armed and assault with a dangerous weapon on Robert B. Clark. He was sentenced to concurrent terms of ten years to life on the former count and one to three years on the latter. Appellant alleges numerous errors, none of which were raised at trial. After careful consideration of the record and arguments advanced by the parties, we find no substantial error which would merit reversal and evidence which overwhelmingly supports the verdict. Accordingly, we affirm.

### I

The sequence of events immediately surrounding the assault must be gleaned primarily from the testimony of the three parties involved, Messrs. Thompson, Clark and Martin, there being no other eyewitnesses to the crime. The testimony of Thompson and Clark was consistent and corroborating. On the evening of April 11, 1970, shortly before 11:00 p. m., Robert B. Clark, dressed in a tuxedo and accompanied by a female companion, parked his car at the corner of 18th and P Streets, N.W., from whence he proceeded on foot less than one block to a nightclub near Dupont Circle. When he parked the car, his suspicion had been aroused by a man "leaning on the traffic light and looking at [he] and [his] date and looking at [his] car . . . [who] acted a little strangely." Apprehensive because he had left his overcoat in the car, Mr. Clark decided that it would be wise to return and move the vehicle to another location. He escorted his companion to the doorway of the nightclub where he encountered an acquaintance, George Thompson, who also planned to attend the nightclub dance. He asked Thompson to accompany him back to the car. The two men embarked, and as they approached the intersection of 18th and P Streets, Thompson noticed that there was a man, the appellant herein, apparently trying to force open the window of Clark's car. As Thompson and Clark approached, the man crossed over to the

other side of the automobile where he was apparently trying to force the other window open. Thompson and Clark both yelled for him to "get away from that car." At this point appellant was standing near the rear of Mr. Clark's car on the street side; Mr. Thompson had crossed in front of Clark's car to the street side and was about six feet from appellant; and Clark was still on the sidewalk proceeding towards the rear of his car.

Thompson testified that Clark next yelled to appellant to the effect that it was Clark's car. Thereupon appellant, who was standing with his hands at his side in a relaxed position, lunged at Thompson and struck him on the side of the neck. By this time Clark had proceeded to the street behind the appellant, and appellant turned on him. Clark hit appellant, causing him to strike his head on the rear of the car and fall to the pavement. As he fell, a knife scooted from his hand and Thompson retrieved it. It was then that Thompson discovered that his own neck had been slit, a wound of about six inches which exposed the jugular vein and required thirty-two stitches to close.

Clark testified that upon observing a scuffle breaking out between appellant and Thompson he ran around the rear of the car to the street side. He observed Thompson going to his knees and appellant with one arm raised as if to strike another blow. He allegedly tapped appellant on the shoulder shouting "What are you doing," at which point appellant turned and swung at Clark's face with a knife or other sharp object. Clark ducked and then struck appellant several times causing him to fall and hit his head on the rear of the car thereby breaking the taillight.

The Government introduced Metropolitan Police Officer Landon H. Lewis, who had arrived at the scene shortly after the incident and found appellant in a semi-conscious state, with Mr. Clark assisting in administering first aid. According to his testimony, shortly after the incident in question appellant was

taken to George Washington hospital for treatment. After questioning several individuals on the scene and seeing that Mr. Thompson was properly ministered to, Officer Lewis also proceeded to George Washington Hospital. By 1:00 a. m. appellant had been treated and had regained full consciousness and Officer Lewis testified that he was coherent and appeared to be cognizant of his surroundings. Appellant was then informed of the injury to Mr. Thompson, placed under arrest and advised of his rights. At that point, according to Officer Lewis, appellant said "Why am I here and why am I in this condition? I am good with a knife. The guy should be dead." Upon being released from the hospital and transported to the police station appellant also said "I should have killed the guy."

According to appellant, who testified in his own behalf, he had been at the home of his girlfriend where he had taken a "few drinks" while awaiting her return. He left the apartment and walked to the corner to await the bus, where he "might have been leaning on Mr. Clark's car." Mr. Clark, according to appellant, then came up behind him and asked him something. Appellant did not see him. Clark then allegedly hit him on the head "with a pipe or something," rendering appellant unconscious. Later appellant claimed that the "few drinks" amounted to a quart of Vodka, all contrary to the testimony of his purported girlfriend who stated that there was never any liquor in her apartment and that when she arrived home shortly after appellant left there were absolutely no signs of drinking.[1] During cross-examination appellant substantially revised his testimony. While still maintaining that he did not see Mr. Clark or the object with which he was purportedly struck, he stated that Clark had hit him on the

*front* of the head with the object. The following colloquy then occurred:

Q. [Prosecuting Attorney] The first thing that happens is Mr. Clark comes and hits you with an object and you wake up in the hospital, is that correct?

A. [Martin] That's correct.

Q. And you never struck Mr. Clark or Mr. Thompson, is that correct?

A. That is correct.

Q. Then, how do you explain how Mr. Thompson as he was falling back happened to cut his throat? . . .

A. I believe—I didn't fall down the first time he hit me with this object. He hit me I'd say two maybe three times. As he was hitting me with this object the other fellow, Mr. Thompson, had grabbed me trying to pull me down and as I was falling he fell down with me.

Appellant further testified that as he fell, Thompson must have cut his throat on the taillight of the car, which presumably was already broken. This was not only contrary to the testimony of Clark and Thompson, but was also refuted by Dr. Harris Slavick, the physician who treated Thompson. Dr. Slavick testified that, in his opinion, a wound as clean and sharp as the one in question must have been caused by a knife, razor or other similar instrument, and could not have been caused by a broken taillight. Appellant also introduced the testimony of Mr. and Mrs. Hampton, friends with whom he had briefly conversed just prior to the incident. On direct examination they testified that appellant was drunk, although on cross-examination they both conceded that appellant manifested none of the physical signs commonly associated with intoxication.[2] Moreover, Thompson and Clark had both testified, concordant with the

---

1. Miss Dickerson, appellant's reputed girlfriend, further testified that appellant had asked her to perjure herself in court—indeed, had offered to bribe her—by claiming that she was an eyewitness and lying about the incident.

2. Specifically, one or both testified that they could understand appellant when he spoke, that he did not stagger, bang the sides of the wall or in any other way act offensive or obnoxious, and that he appeared to understand all that was said to him.

testimony of Officer Lewis, that from their observations appellant did not appear to be intoxicated.

## II

As a threshold matter appellant failed to preserve any of the issues which he now raises by timely objection at trial. This is contrary to Fed.R.Crim.P. 51, which provides that a party should make "known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor . . . ." The significance of this requirement lies not only in the important "need for a record, developed by adversary processes, on which appellate consideration and resolution can safely proceed," [3] but also in considerations of fairness to the parties and the public in bringing litigation to an end after a full and fair opportunity has been afforded to present all issues of fact and law.[4] Moreover, the rule serves the simple purpose of apprising the trial judge of errors so that he may correct them immediately and thereby maximize the likelihood of a just outcome. Rucker v. United States, 92 U.S.App.D.C. 336, 206 F.2d 464 (1953). The circumstances are particularly unfavorable to appellant since he alleges error in the jury instructions. Rule 30 specifically provides that no party may assign any portion of the charge as error unless he objects before the jury retires *and* distinctly states the matter to which he objects and the grounds for his objection. The matter

would end here were it not for Rule 52(b) [5] which permits the reviewing court to take notice of "[p]lain errors or defects affecting substantial rights." [6] Having carefully considered the record as a whole, we are now of the opinion that appellant has demonstrated only one error that merits comment. We proceed to a discussion of whether that error affected substantial rights.

## III

■■ Appellant was convicted of one count of assault with intent to kill while armed, a crime requiring specific intent. *See, e. g.,* United States v. Bryant, 137 U.S.App.D.C. 124, 420 F.2d 1327 (1969). It is beyond dispute that the burden of proof rests with the Government and that, once the defense of intoxication is interjected, the burden rests with the Government to establish that at the time the offense was committed the defendant had the capacity to form the requisite specific intent. *See, e. g.,* Womack v. United States, 119 U.S.App.D.C. 40, 336 F.2d 959 (1964); Heideman v. United States, 104 U.S. App.D.C. 128, 259 F.2d 943 (1958), cert. denied, 359 U.S. 959, 79 S.Ct. 800, 3 L. Ed.2d 767 (1959); and Edwards v. United States, 84 U.S.App.D.C. 310, 172 F.2d 884 (1949). According to appellant, the trial court committed prejudicial error by shifting the burden of proof to the defendant when the following instructions were issued:

Now, as you know, ladies and gentlemen of the jury, mere drinking is not

3. United States v. Lewis, 140 U.S.App.D.C. 40, 433 F.2d 1146, 1152 (1970).

4. United States v. Atkinson, 297 U.S. 157, 159, 56 S.Ct. 391, 80 L.Ed. 555 (1936) and Johnston v. Reily, 82 U.S.App.D.C. 6, 160 F.2d 249 (1947). While we realize that such arguments have more force in the context of civil proceedings than in criminal proceedings, a criminal defendant is protected by the further safeguard of Fed.R.Crim.P. 52(b) which is considered below.

5. However, as the court stated in United States v. Ostendorff, 371 F.2d 729, 731 (4th Cir. 1967), cert. denied, 386 U.S. 982,

87 S.Ct. 1286, 18 L.Ed.2d 229 (1967), "it was never intended that Rule 52(b) be applied in such a way as to destroy Rule 30 . . . . ."

6. The converse of Rule 52(b) under the facts of this case is Rule 52(a), which provides:

Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

These rules will therefore be used interchangeably throughout much of the opinion.

intoxication. You must find *beyond a reasonable doubt* that the defendant at the time and place in question if he did perform the act was in such a mental state that *he was not capable of forming the specific intent in question.* (Emphasis added.)

Standing alone, this instruction is plainly erroneous. However, the numerous occasions on which we have examined alleged errors in jury instructions have resulted in the emergence of several propositions to assist us in our evaluation. Paramount among them is the principle that jury instructions are to be considered as a whole, rather than as isolated passages.[7] A not entirely dissimilar case is Suggs v. United States, 132 U.S.App.D.C. 337, 407 F.2d 1272 (1969). In a conviction for robbery, the trial judge had correctly instructed the jury that one of the essential elements of robbery was that the defendant took the property unlawfully and with the intent to convert it permanently to his own use. The judge went on to instruct that the specific intent necessary for robbery could not be formulated if defendant was too intoxicated to form it. Immediately thereafter, however, the jury was incorrectly informed that they might infer that defendant was guilty if he knowingly had in his possession without adequate explanation property recently taken from complainant. Noting that counsel had failed to object to these instructions, this court held that those instructions, considered as a whole, did not constitute error within the meaning of Fed.R. Crim.P. 52(b). In so doing, the court cautioned against isolating a portion of the whole charge to the jury:

> It is not difficult of course to isolate an individual sentence in a series of jury instructions thereby highlighting its special meaning and obscuring the collective impact of the jury instructions taken as a whole. Such an approach, however, tends to focus on the trees and misses the forest. Nor can we accept the notion that jurors give instructions the supercritical scrutiny which an appellate court can provide. We are satisfied that considered as a whole, rather than dealing with parts taken out of context, the charge abundantly covered the essential elements.

407 F.2d at 1276–1277. Similarly, in Howard v. United States, 128 U.S.App. D.C. 336, 389 F.2d 287 (1967), where the judge had improperly charged the jury in a murder trial that malice could be inferred from the use of deadly weapons, the court refused to reverse. Not only did the defendant fail to object to the charge, but also the proof of malice was strong and the court was "aided, too, by the trial court's final words on malice, which helped to correct the error . . . .. Even if a portion of a trial court's instructions is incorrect, an appellate court need not reverse if the error is 'cured by a subsequent charge or by a consideration of the entire charge

---

7. *See, e. g.,* United States v. Gaither, 142 U.S.App.D.C. 234, 440 F.2d 262 (1971); United States v. Johnson, 140 U.S.App. D.C. 54, 433 F.2d 1160 (1970); Carter v. United States, 138 U.S.App.D.C. 349, 427 F.2d 619 (1970); United States v. Porter, 139 U.S.App.D.C. 19, 429 F.2d 203 (1970); United States v. Thurman, 135 U.S.App.D.C. 184, 417 F.2d 752 (1969), cert. denied, 397 U.S. 1026, 90 S.Ct. 1269, 25 L.Ed.2d 535 (1970); Suggs v. United States, 132 U.S.App.D.C. 337, 407 F.2d 1272 (1969); United States v. Hayward, 136 U.S.App.D.C. 300, 420 F.2d 142 (1969); Bynum v. United States, 133 U.S.App.D.C. 4, 408 F.2d 1207 (1968), cert. denied, 394 U.S. 935, 89 S.Ct. 1211, 22 L.Ed.2d 466 (1969); Jones v. United States, 131 U.S.App.D.C. 212, 404 F.2d 212 (1968); Howard v. United States, 128 U.S.App.D.C. 336, 389 F.2d 287 (1967); Scurry v. United States, 120 U.S. App.D.C. 374, 347 F.2d 468 (1965), cert. denied, 389 U.S. 883, 88 S.Ct. 139, 19 L. Ed.2d 179 (1967); Nixon v. United States, 114 U.S.App.D.C. 21, 309 F.2d 316 (1962), cert. denied, 385 U.S. 963, 87 S.Ct. 405, 17 L.Ed.2d 307 (1966); McFarland v. United States, 85 U.S.App.D.C. 19, 174 F.2d 538 (1949); and McAffee v. United States, 70 App.D.C. 143, 105 F.2d 21 (1939).

. . . .'"[8] *Howard* illustrates a second point to be considered in our evaluation—strong evidence supports a finding of no prejudice. *Accord,* Cooper v. United States, 123 U.S.App.D.C. 83, 357 F.2d 274 (1966); Scurry v. United States, 120 U.S.App.D.C. 374, 347 F.2d 468 (1965), cert. denied, 389 U.S. 883, 88 S.Ct. 139, 19 L.Ed.2d 179 (1967); and Nixon v. United States, 114 U.S.App. D.C. 21, 309 F.2d 316 (1962), cert. denied, 385 U.S. 963, 87 S.Ct. 405, 17 L.Ed. 2d 307 (1966).

While these propositions are necessary ingredients of our analysis, they do not elucidate the ultimate question which relates to the standard we must apply in determining whether error affecting substantial rights has occurred. The Government urges that the relevant standard was articulated by this court in United States v. Thurman, 138 U.S. App.D.C. 349, 417 F.2d 752, 753 (1969), cert. denied 397 U.S. 1026, 90 S.Ct. 1269, 25 L.Ed.2d 535 (1970):

> In evaluating an asserted error in a portion of a jury instruction we must, of course, examine the charge as a whole to determine whether there was a likelihood of misleading the jury to the extent that it is *more probable than not* that an improper verdict was rendered. (Emphasis added.)

In *Thurman,* however, the court based its holding on the fact that defense counsel not only failed to object to the charge, but also specifically requested and urged the judge to give the instruction objected to on appeal. Moreover, *Thurman* involved an allegedly ambiguous instruction on the issue of self-defense, whereas we are concerned here with one of the fundamental components of due process—the burden of proof beyond a reasonable doubt.[9] We have recently had occasion to enunciate the appropriate standard in United States v. Hayward, 136 U.S.App.D.C. 300, 420 F. 2d 142 (1969), a case involving an appeal from a conviction for first degree murder. The defendant's primary defense had been alibi, and the trial judge had correctly instructed the jury that if the Government failed to satisfy the jury beyond a reasonable doubt that the defendant was present at the time and place where the offense was allegedly committed, they *must* find him not guilty. The jury was then instructed, however, that if the Government had proven beyond a reasonable doubt that defendant was at the scene of the crime, they *must* convict him. By instructing the jury that they *must* convict under these circumstances the trial judge undermined an essential element of the jury function. Since a jury trial is a constitutional right guaranteed by the sixth amendment, the applicable standard for determining whether the error was harmless was that established by the Supreme Court in Chapman v. Cal-

---

8. 389 F.2d at 291, citing for authority Southern Pac. Co. v. Souza, 179 F.2d 691, 694 (9th Cir. 1950) and Redfield v. United States, 117 U.S.App.D.C. 231, 328 F.2d 532 (1964), cert. denied, 377 U.S. 972, 84 S.Ct. 1654, 12 L.Ed.2d 741 (1964).

9. *See* In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); Davis v. United States, 160 U.S. 469, 488, 16 S.Ct. 353, 40 L.Ed. 499 (1895); and United States v. Powell, 145 U.S.App.D.C. 332, 449 F.2d 994, 997–98 (1971). As the Court stated in In re Winship, 397 U.S. at 364, 90 S.Ct. 1068, 1072:

> [T]he reasonable-doubt standard is indispensible, for it "impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue."

Moreover, use of the reasonable-doubt standard is indispensible to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty. (Citations omitted.)

ifornia, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967):

> [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

*See also* Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The Court has recently illuminated the standard in Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), a case involving the admission into evidence of multiple confessions by defendant, the last of which was tainted, where it concluded:

> Our review of the record, however, leaves us with no reasonable doubt that the jury at petitioner's . . . trial would have reached the same verdict without hearing [the testimony of a police officer who posed as petitioner's cellmate in order to obtain a confession]. [T]he use of the additional evidence challenged in this proceeding and arguably open to challenge was, beyond reasonable doubt, harmless.

407 U.S. at 377–378, 92 S.Ct. at 2178. *Chapman* and its progeny therefore exhort an examination of the evidence by the reviewing court with a view toward determining whether the error meant the difference between acquittal and conviction. Thus, in considering the alleged error in the present case, we must determine, beyond a reasonable doubt, whether the same result would have been reached had the judge omitted the erroneous sentence in his instructions or had he correctly explained the burden in that sentence.

## IV

In the present case, while instructing the jury on the general burden of proof prior to issuing the erroneous sentence, the trial judge had on numerous occasions directed the jury's attention to the fact that the entire burden was on the Government.[10] Moreover, the paragraph in question was followed immediately by two correct paragraphs on the issue of intoxication:

> On the other hand, if you find that the Government has failed to prove beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant was capable of determining or of forming the specific intent to commit the offense with which he is charged or the offenses, and that the specific intent to do so— then you must if you find that the Government has failed to prove that the defendant in this case was capable of forming the specific intent then you may find the defendant not guilty.

> If you find that the Government has in this particular case, that if there is doubt in your mind, then the doubt may be determined in favor of the defendant so far as the intent.

■ We have already indicated the nature of the evidence presented on the issue of intoxication. Three Government witnesses testified that appellant did not appear to be intoxicated. When appellant took the stand, his testimony on the issue was inconsistent and contradictory. One of the three witnesses presented by appellant admitted in

---

10. Consider the following passages from the instructions:

> The defendant is not required to establish his innocence under our system of jurisprudence. The law never imposes upon a defendant in a criminal case the burden or the duty of calling any witness or producing any evidence whatsoever in his defense . . . .

> . . . . .

> And this presumption of innocence attends him throughout the progress of the trial and it remains with him until it is overcome by evidence proving his guilt to your satisfaction beyond a reasonable doubt.

> . . . . .

> Now, in order to find the defendant guilty of the offense the Government must prove beyond a reasonable doubt the following essential elements of the offense.

> . . . . .

> Second, that he did so with specific intent to kill the complainant.

open court that appellant had offered to bribe her; while the other two, friends of the appellant, testified that he displayed none of the physical manifestations of intoxication. Finally, the very nature of the acts in question, whereby appellant was able to lunge nearly six feet and deliver a nearly fatal wound to one adversary and then turn and attempt to overcome a second, supports the conclusion that he was in full possession of his faculties.[11]

█ In view of the instructions considered as a whole and the substantial evidence presented at trial, we are convinced beyond a reasonable doubt that appellant was not prejudiced. Accordingly we affirm.

BAZELON, Chief Judge (dissenting):

I agree with the majority that the standard to be applied in reviewing the trial judge's erroneous instruction is the one set out in Chapman v. California.[1] Since proof beyond a reasonable doubt is essential to the constitutional right to due process,[2] the erroneous instruction

of the trial judge concerning the burden of proof amounted to constitutional error and the *Chapman* standard must apply. But because I cannot conclude beyond a reasonable doubt that the jury would have reached the same verdict if instructed properly as to intoxication, I would reverse and remand for new trial.

I

Once the issue of intoxication is raised, the burden rests on the government to show beyond a reasonable doubt that defendant's drinking did not destroy his capacity to form the requisite intent for the crime.[3] After he instructed the jury on the requirement of specific intent, the judge noted that the issue of intoxication had been raised and that intoxication "may be introduced into evidence to determine state of mind. . . . ." He then explained:

[I]ntoxication pertains to the intent, an essential element of the offense with which the defendant is charged. As you have already been told, specific intent is one of the essential ele-

---

11. Chief Judge Bazelon wrote a carefully reasoned dissenting opinion in Suggs v. United States, *supra*, which serves as an excellent device to illustrate that the facts in the present case are even more convincing in terms of affirmance than those in *Suggs*. First, Judge Bazelon stressed that the incorrect instruction was the last of a series of sentences, and that it was imbedded by the trial judge's terminology in the jury's minds:

> The incorrect statement concerning unexplained possession was the last thing the jury heard in connection with the robbery charge, and they were told that it represented a "further principle" to the rule that intoxication is a defense. 407 F.2d at 1278. Neither is true in this case—indeed, the exact opposite is true since the two correct paragraphs followed the erroneous sentence. Judge Bazelon also argued persuasively that should the jury have accepted the inference incorrectly related to them, they may well have concluded that it was unnecessary to even resolve the issue of specific intent and may, in fact, have disregarded it altogether. In the present case, on the other hand, the jury *had to* reach the issue of intent and the defense of intoxication. At issue is the

burden of proof with which they resolved it. Finally, Judge Bazelon urged that an "apparently substantial" defense of intoxication was presented by the appellant in *Suggs*, drawing particular attention to the fact that the alleged thief made off only with a pair of false teeth. Here, of course, we are considering an assault by one allegedly intoxicated individual on two other individuals in which the former was able to inflict swift and telling damage before succumbing.

1. 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (where an error affecting constitutional rights is to be held harmless, it must be found to be harmless beyond a reasonable doubt).

2. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) :

> Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

3. *See, e. g.* Womack v. United States, 119 U.S.App.D.C. 40, 336 F.2d 959 (1964).

ments. Even if the defendant in this particular case may have been intoxicated to some degree, if you, as jurors, determine from the evidence that the Government has proved beyond a reasonable doubt that the defendant was capable of knowing, that is, knowing what he was doing so far as the specific intent is concerned, to commit the offense in question, then you may find that the Government may have proved beyond a reasonable doubt all the essential elements of the offense.

Thus far, the jury knew only that intoxication pertained to intent, an essential element of the crime on which the prosecution had the ultimate burden of proof. The trial judge then went on to discuss what constitutes "intoxication":

> . . . [M]ere drinking is not intoxication. You must find beyond a reasonable doubt that the defendant at the time and place in question if he did perform the act was in such mental state that he was not capable of forming the specific intent in question.

The instruction is clearly erroneous and a lay jury could easily have concluded that intoxication is a defense which is to be considered only when the *defendant proves* beyond a reasonable doubt that his drinking was so severe as to destroy his capacity to form the intent. In other words, by defining "intoxication" as a state of being in which the defendant is unable to form intent, and by placing a heavy burden on the defendant to show that his drinking amounted to such "intoxication," the court removed the state's burden of showing beyond a reasonable doubt that the defendant had the capacity to form the intent.[4]

Of course, as the majority states, jury instructions must be considered as a whole rather than in isolated passages. The majority believes that any harm resulting from the erroneous instruction was purged by other language which emphasized that the burden was on the government to prove beyond a reasonable doubt that the defendant was capable of forming the specific intent charged. But I find that the court's instructions were, as a whole, far from clear on the matter of intent.[5] And even if the jury were crystal clear as to who had the burden on this issue, the jury could have concluded that just drinking was not relevant to intent until the *defendant* had shown that the drinking amounted to "intoxication"—that it diminished his capacity.[6]

Appellant certainly had a colorable intoxication defense. He testified that shortly before the scuffle he had drunk a quart of vodka; a witness, who later claimed the appellant had wanted her to lie but that she had refused, nonetheless testified that the defendant was drunk; two other defense witnesses testified that he was drunk; and even his victims

---

4. *Compare* Suggs v. United States, 132 U.S.App.D.C. 337, 407 F.2d 1272 (1969) (Chief Judge Bazelon dissenting).

5. The instruction immediately following the erroneous charge, which the majority quotes at length, is also confusing and its conditional language could easily have reenforced the jury's misconception:

> . . . [I]f you find that the Government has failed to prove that the defendant in this case was capable of forming the specific intent *then you may* find the defendant not guilty. (emphasis added)

6. The judge's subsequent clarification of his instructions on the difference in the intent elements for assault with intent to kill and assault with a dangerous weapon also could be taken as characterizing intoxication as a positive defense (to be proven by the defendant):

> . . . [T]he court has already advised you that counts 3 and 6, and counsel has argued to you in his final argument, that *intoxication is not a defense* because assault with a dangerous weapon is a general intent as separated or taken out from specific intent. And therefore, *you need not consider the defense of intoxication* so far as counts 3 and 6 are concerned. (Emphasis added.)

testified that he acted strangely, as if he were drunk.[7]

In these circumstances I cannot conclude beyond a reasonable doubt that the erroneous instruction of the trial judge was harmless error.

## II

As the majority notes, the issues which appellant now raises were not preserved at trial by his court-appointed attorney. The record indicates that counsel not only failed to object to the judge's clearly erroneous jury instructions, but also failed to object to the Government's introduction of certain inculpating statements made by the appellant to a police officer, after being taken into custody. The improper admission of this damaging confession would surely be an error affecting substantial rights.[8] And I am persuaded that the evidence on the record does not sustain the heavy burden on the government to show a valid waiver of the appellant's privilege against self-incrimination.[9]

As this Court held in United States v. Frazier,[10] the burden on the government to show a valid waiver requires it to prove that the accused received *Miranda* warnings before making his inculpatory statement and that he "was capable of understanding" the warnings when given.

It is not clear from this record whether the *Miranda* warnings were given before the admissions were made. The incriminating statements and the circumstances in which they were secured are described in the testimony of Officer Lewis:

A. At the hospital I placed Mr. Martin [the defendant] under arrest and advised him of his rights.

Q. Did he regain consciousness in your presence?

A. Yes.

Q. And he did appear cognizant of his surroundings?

A. Yes.

Q. Now, when you placed him under arrest and advised him of his rights what, if anything, did he state at that time?

A. He began looking through his trouser pockets. He asked where his knife was. He wanted to know why he was here. Why he was in this condition.

Q. Did he say anything else?

A. Yes, he said, "Why am I here and why am I in this condition. I am good with a knife. The guy should be dead."

On cross examination the officer elaborated on this story:

Q. . . . Now, when you placed Mr. Martin under arrest what did you advise him that he was under arrest for?

A. I advised him he was under arrest for assault with a dangerous weapon . . .

---

7. The majority points out that both prosecution and defense witnesses testified that the appellant did not show many of the usual "physical manifestations of intoxication." However, beyond the testimony referred to in the text, there was testimony by one witness describing appellant's speech as sounding like "he had a load of cotton in his mouth." In any case, for our purposes, intoxication is a question of mental not physical agility.

8. In applying rule 52(b) to cases which (like the one before us) involve the failure of a court appointed attorney to object to an error of the court, we might keep in

mind an observation made by the Supreme Court of Illinois many years ago:
[T]he court owed it to . . . [the defendant] to see that no advantage came to the state by reason of the . . . [inadequacy] of the counsel selected by the court for him.
People v. Blevins, 251 Ill. 381, 393, 96 N.E. 214, 219 (1911).

9. Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

10. 155 U.S.App.D.C. ——, 476 F.2d 891 at p. 892 (1973) (en banc). *See also* Frazier v. United States, 136 U.S.App. D.C. 180, 187, n.31, 419 F.2d 1161, 1168 n.31 (1969).

Q. Was there any mention made that someone had been cut and just what had happened and why he was charged with assault?

A. Yes sir.

Q. He was advised of this?

A. Yes sir.

Clearly the evidence is ambiguous as to when the warnings were given. And the appellant's statement went directly to the all important question of his intent.

Moreover, there are strong indications that the appellant lacked capacity to understand the warnings even if they were timely. There was testimony that he had consumed a great deal of liquor earlier in the evening. He was unconscious for some time before and perhaps right up until his exchange with Officer Lewis.[11] Officer Lewis testified that there were lacerations on the appellant's head, which was heavily bandaged, and that his face was swollen. This suggests that appellant may have suffered a serious head injury. It is very unclear what state of consciousness the appellant was in when the warnings were read to him. All of this presents a substantial question as to whether the appellant was capable of a knowing and voluntary waiver of his rights under *Miranda*.[12] On the basis of the evidence presented, the trial juge hardly had sufficient in-formation on which to base a conclusion that the appellant's statements were admissible.

Since the appellant chose to testify, under the Supreme Court's ruling in Harris v. New York,[13] his inculpatory statements might have been introduced for impeachment purposes even though *Miranda* criteria were not met. However, this does not appear to be the basis on which the government introduced those statements. First, the government contended at trial that it had met the burden of *Miranda*;[14] the government did not argue that the statements were introduced to impeach the appellant. Second, the statements were introduced before the appellant testified.

If the statements were not introduced for impeachment purposes, the government failed to meet its burden under *Miranda*. If the admissions could fall within the *Harris* exception, the circumstances dictate that a limiting instruction was required. Defense counsel cannot be held to have waived a limiting instruction here, particularly since it appears that neither he, the judge, nor the prosecutor believed that the evidence was being introduced only for impeachment purposes.

If this were the only issue presented by this case, I would remand for a hearing to determine whether there was a

11. It is quite clear that the confession was made while the appellant was in custody. Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d 158 (1967), urged by the prosecution as precedent for admission, is therefore inapposite. Although Officer Lewis' testimony is suggestive of an interchange initiated by the police, hence a custodial interrogation, that question is far less clear and should be determined on remand.

12. Officer Lewis testified to a second statement made by the appellant at the police station. That testimony appears below:
. . . He stated to me [at the station] that he was good with a knife. He said "I should have killed the guy." He couldn't understand why he was in the condition he was.
Again, it is unclear whether the appellant had yet been given *Miranda* warnings

that he could understand, what his mental condition was, or what gave rise to this remark—particularly whether it was made in the course of a discussion of his earlier "confession."

13. 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

14. The prosecution relied on a case which did not involve capacity to understand but rather whether refusal to sign a waiver was sufficiently probative of actual misunderstanding to render the waiver invalid. Pettyjohn v. United States, 136 U.S.App.D.C. 69, 419 F.2d 651 (1969), cert. denied 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970); *see* United States v. Frazier, 155 U.S.App.D.C. ——, at ——, 476 F.2d 891, at 897 n. 6 (1973) (en banc).

custodial interrogation and, if so, whether there was a valid waiver.[15]

## III

Even if I were not pursuaded that this case should be reversed and remanded for a new trial, I would remand for resentencing. The Supreme Court has recognized that a defendant's 6th Amendment right to counsel extends to sentencing,[16] and this court has long since held that the right to counsel at sentencing, as at other stages, is the right to the *effective assistance of counsel*.[17] That right includes, at a minimum,

. . . the aid of counsel in marshaling of facts, introducing evidence of mitigating circumstances and in general aiding and assisting the defendant to present his case as to sentence. . . .[18]

The approved draft of the American Bar Association's Project on Standards for Criminal Justice includes minimum standards for the role of defense counsel at sentencing.[19] These standards recognize the following duties: first, counsel should ascertain and explain to his client and the court the alternative dispositions available, including the consequences of each; second, if the presentence report is available to him counsel should seek to verify and supplement the information and evaluate the conclusions contained therein; third, if a report is not available, he should develop his own report for presentation to the court in which he should urge any ground that supports a proper disposition favorable to the accused; fourth, he should make special efforts to investigate dispositions particularly appropriate to his client so that he can suggest a program of rehabilitation based on his knowledge of the defendant and available community resources;[20] fifth, he should insure that all the information relevant to sentencing appears in the record.

15. When faced with a challenge to a confession raised for the first time on appeal, this court remanded for a hearing on the admissibility of the confession rather than for a new trial in Frazier v. United States, 136 U.S.App.D.C. 180, 188, 419 F.2d 1161, 1169 (1969). For the same reasons, I would remand this case for a hearing on the confession issue, if it were not for the jury instruction discussed at part I of this opinion.

16. Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); *see* Moore v. Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167 (1957).

17. Gadsden v. United States, 96 U.S.App. D.C. 162, 165, 223 F.2d 627, 630 (1955):
   The right to effective assistance of counsel at the sentencing stage of the proceeding is guaranteed by the Constitution.
   *See* McConnell v. Rhay, 393 U.S. 2, 4, 89 S.Ct. 32, 34, 21 L.Ed.2d 2 (1968):
   The right to counsel at sentencing must, therefore, be treated like the right to counsel at other stages of adjudication.

18. Mempa v. Rhay, *supra*, 389 U.S. at 135, 88 S.Ct. at 257 (1967); *see* Von Moltke v. Gillies, 332 U.S. 708, 721, 68 S.Ct. 316, 92 L.Ed. 309 (1948).

19. Standards Relating to the Defense Function, Approved Draft, 1971, American Bar Association Project on Standards for Criminal Justice (1971) § 8.1. The standards set out here provide a good basis for assessing whether an attorney has rendered effective counsel to his client. *Accord*, Standards Relating to Sentencing Alternatives and Procedures, Approved Draft, 1971, American Bar Association Project on Standards for Criminal Justice (1971) § 5.1; *see* Dash, The Defense Lawyer's Role at the Sentencing Stage of a Criminal Case, 54 F.R.D. 315, 316 (1968).

20. The Offender Rehabilitation Division of the District of Columbia Public Defender Service has a professional staff which conducts investigations so that an appointed defense lawyer can go to court armed with a thorough and accurate presentence report and a positive rehabilitation plan. This program is commended by the ABA study, Standards Relating to Sentencing Alternatives and Procedures, *supra* note 19 at 251, which observes that the D.C. program "could well make the difference between an offender who languishes in jail and will wind up there again and an offender who successfully supports his family while at the same time receiving the help he needs." *See also* Pye, The Administration of Criminal Justice, 66 Colum.L.Rev. 286 (1966).

The record before us suggests that counsel in this case failed to do any of these things. He had only the following to offer at sentencing:

> I have nothing to add to the information I am certain is in the probation report, if your honor please. And I believe Mr. Martin doesn't desire to make any statements.

Counsel's remarks make it doubtful that he even saw the presentence report,[21] or "[took] steps to see that . . . [the] sentence was not predicated on misinformation." [22] Effective representation requires the services of a conscientious and diligent advocate.[23] Where counsel offers but a *pro forma* appearance at sentencing, as on the record before us, clearly the accused has been denied the effective assistance of counsel [24] at that crucial "step in the proceedings against him." [25]

The problem of ineffective assistance —particularly in cases involving indigent defendants—is not new to this court,[26] though it is an issue we have come to face more often of late.[27] Nor

---

21. The prosecutor "urge[d] the court to impose a maximum sentence of life imprisonment," because of appellant's "prior felony convictions" and the lack of "mitigating circumstances." Appellant was sentenced to a prison term of 10 years to life. He was eligible to receive as little as a 2 year sentence.

Defense counsel never pointed out what was clear even from the presentence report; that appellant's "criminal record does not show any criminal conduct since 1960," that none of his prior convictions were for crimes of violence, and "that he apparently has been able to maintain himself financially and has been living at one place of residence approximately seven years."

But, it is necessary to point out that defense counsel cannot rely on the Probation Service presentence report. Such reliance represents a substantial abdication of defense counsel's role. *See* text at note 19, *supra.* Just how serious is the danger of unreliability in these reports appears from the following. The Federal Probation Service currently has 808 authorized staff positions nationwide. In order to meet the minimum standards for presentence and supervision functions set by the President's 1967 Crime Commission report for fiscal (FY) 1974, the agency would have to nearly triple its staff by adding 1438 new officers. The Judicial Conference has recommended that Congress authorize just 340 new positions. For the previous year (FY1973), Congress granted only one-half of the Conference's recommendation. The implication of these figures canont be lost on diligent defense counsel.

22. That this is a responsibility of counsel was recognized in Mempa v. Rhay, 389 U.S. at 133, 88 S.Ct. 254, quoting Townsend v. Burke, 334 U.S. 736, 741, 68 S. Ct. 1252, 92 L.Ed. 1690 (1958).

23. Tate v. United States, 123 U.S.App.D.C. 261, 269, 359 F.2d 245, 253 (1966). (Counsel must act not as a passive friend of the Court but as a diligent, conscientious advocate). The ABA suggests that counsel should "assume the same position of advocacy [at sentencing] that is his duty at the trial." ABA Standards Relating to Sentencing Alternatives and Procedures, *supra* note 19 at 246.

24. United States v. Hammonds, 138 U.S. App.D.C. 166, 173, 425 F.2d 597, 604 (1970) (A *pro forma* defense does not meet the minimum requirements for effective assistance of counsel).

25. "[The accused] requires the guiding hand of counsel at every step in the proceedings against him. . . . If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect." Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed.2d 158 (1932) (in regard to the right to counsel at the guilt determining phase, but the right was later extended to the sentencing stage, *see* note 16, *supra*). Thus the Supreme Court recognized how essential the effective assistance of counsel is, particularly to indigent defendants like the one before us today.

26. Gadsden v. United States, 96 U.S.App. D.C. 162, 223 F.2d 627 (1955), where we found that appellant was denied effective counsel at sentencing when there was no showing that substituted counsel was prepared, or had the opportunity to prepare, and at the hearing counsel made no effort to speak on behalf of his client. *See, e. g.,* Jones v. Huff, 80 U.S.App.D.C. 254, 152 F.2d 14 (1945).

27. United States v. Benn & Hunt, 155 U.S. App.D.C. ——, 476 F.2d 1127 (1972) (Chief Judge Bazelon dissenting) ; United States v. Burks, 152 U.S.App.D.C. 284, 470 F. 2d 432 (D.C.Cir. Oct. 19, 1972) (Chief

is ineffectiveness always a result of a lawyer's incompetence or lack of diligence. Particularly in regard to sentencing, it may be more of an institutional problem, reflecting a common misunderstanding of counsel's role [28] and a prevalent but far too narrow conception of an appointed attorney's obligations to his client.[29] But that is all the more reason why we can no longer delay confronting the problem. In any case, our real concern is not the culpability of counsel or the reason for his failure. It is the denial of the defendant's 6th Amendment rights.

A remand for resentencing on the grounds of ineffectiveness represents no infringement on the trial judge's discretion in sentencing. On the contrary, its purpose is to insure that the sentencing judge has adequate information on which to base that exercise of discretion. Because the judge will often possess a great deal of doubt about the nature and character of the defendant and the appropriate sentence to be imposed,

> [e]ven the most self-assured judge may well want to bring to his aid every consideration that counsel for the accused can appropriately urge.[30]

Since the appellant was denied his constitutionally guaranteed right to the effective assistance of counsel at sentencing, I would vacate his sentence and remand the case for resentencing.

Judge Bazelon concurring) ; United States v. Smallwood, 153 U.S.App.D.C. 387, 473 F.2d 98 (1972) (Chief Judge Bazelon concurring) ; Matthews v. United States, 145 U.S.App.D.C. 323, 449 F.2d 985 (1971) ; United States v. Hammonds, 138 U.S.App.D.C. 166, 425 F.2d 597 (1970) ; Bruce v. United States, 126 U.S. App.D.C. 336, 379 F.2d 113 (1967).

28. As the commentary to the ABA Standards observes :

> It is unfortunately too often the case that the defense attorney considers his job completed once he has assisted the defendant through the guilt phase of the proceedings and perhaps jockeyed for the most lenient sentencing judge. . . . ABA Standards Relating to Sentencing Alternatives and Procedures, *supra* note 19 at 241.

29. It is deserving of mention that according to a recent survey of federal offenders sentenced during 1970, those with appointed counsel received considerably longer sentences than those with retained attorneys. The average sentence weight for defendants with assigned counsel was 7.2 as compared to 5.7 for those with retained counsel. In regard to assault and homicide offenses, the category of the charges in the case before us, the average sentence weight for defendants with court appointed lawyers was 8.3 as compared to 6.8 for those with retained counsel. Table 9a in Administrative Office of the United States Courts, Federal Offenders in the United States District Courts—1970 at 49 (1972).

30. Carter v. Illinois, 329 U.S. 173, 178, 67 S.Ct. 216, 220, 91 L.Ed.2d 172 (1946) ; *see* Martin v. United States, 182 F.2d 225, 227 (5th Cir. 1950) :

> There is then a real need for counsel [at sentencing]. Then is the opportunity afforded for presentation to the Court of facts in extenuation of the offense, or in explanation of defendant's conduct ; to correct any errors or mistakes in reports of the defendants' past record ; and, in short, to appeal to the equity of the Court in its administration and enforcement of penal laws. Any Judge with trial Court experience must acknowledge that such disclosures frequently result in mitigation, or even suspension, of penalty.