**UNITED STATES of America**

v.

**Eugene R. FRAZIER, Appellant.**

No. 23528.

United States Court of Appeals,
District of Columbia Circuit.

Jan. 26, 1973.

Ira S. Siegler, Washington, D. C. (appointed by this court) was on the brief for appellant.

Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry, Thomas C. Green and John O'Brien Clarke, Jr., Asst: U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB, and WILKEY, Circuit Judges, sitting en banc.

McGOWAN, Circuit Judge:

The only issue before the court *en banc* in this appeal from a conviction of armed robbery (22 D.C.Code § 2901) is whether the District Court erred in its conclusion that, on the evidence before it, the Government had sustained its burden of establishing a knowing waiver by appellant of his right to independent legal assistance after his arrest. Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

When the case was first before a panel of this court, a majority thought that a circumstance appearing in the prosecution's evidence at trial raised a doubt about the state of appellant's mind in making the seeming waiver, which warranted a remand for a supplementary inquiry. Frazier v. United States, 136 U. S.App.D.C. 180, 419 F.2d 1161 (1969), Circuit Judge (now Chief Justice) Burger, dissenting. On remand, an evidentiary hearing was held at which the Government presented testimony with respect to appellant's capacity to understand the proper warning concededly given him; and the District Court made findings of fact from which it concluded that such capacity existed. Although none of these findings were rejected by the panel on its second consideration of the case, a majority reversed the conviction in an opinion issued February 24, 1971, from which Judge Nichols of the United States Court of Claims, sitting by designation, dissented. We granted rehearing *en banc* because the sharp and persisting differences within the panel suggested that the case, although something of a sport on its facts, might have important implications with respect to judicial definition of the responsibilities of law enforcement officers in the administration of the *Miranda* rule. On the record made on remand, we sustain the District Court and affirm the conviction.

I

At the remand hearing, Officer Sandy of the Metropolitan Police Department testified that he had arrested appellant at 4:15 P.M. on September 7, 1966, under the authority of an arrest warrant issued in respect of the robbery of a business establishment known as Mike's Carry-Out Shop.[1] The arrest was made on the street, and Sandy promptly read to appellant the *Miranda* warning on a card known as P.D. Form 47. Appellant's response was to say: "You didn't have to read it to me in the first place. I already know my rights." Appellant was then taken to the precinct station where he was searched and booked. Sandy telephoned Detective Keahon of the Robbery Squad at police headquarters—the officer who had procured the issuance of the arrest warrant—to report appellant's arrest. Keahon asked that appellant be brought to his office, and that was done. Sandy testified that throughout this period he had no further conversation with appellant; and that appellant was completely cooperative, in apparent command of himself, and not under the influence of alcohol or narcotics.[2]

---

1. This offense, committed on July 26, 1966, is not the source of the appeal before us, which involves rather the robbery of the Meridian Market on August 24, 1966. Appellant initially pleaded not guilty to the crime for which he was arrested, and ultimately went to trial on that charge after having been committed to St. Elizabeths for a mental examination, which found him competent to stand trial and free of mental disease. Before the trial was finished, however, appellant sought to substitute a plea of guilty and was given leave to do so. He was sentenced to a term of two to seven years, running concurrently with the sentence of five to fifteen years imposed in this case. That judgment has not been appealed.

2. Officer McGinnis, who was on patrol with Sandy at the time of the arrest, testified

to the same effect. He added that, after the search at the precinct station which turned up $103.00 on appellant's person, and while Sandy was telephoning Keahon, he [McGinnis] had the following interchange with appellant with relation to still another robbery which had occurred that morning:

And I asked Mr. Frazier: Where did this money come from? From the hold-up this morning? He looked at me and said, "You are not going to believe this, but I didn't hold that lady up." He said, "I was in that store." He said that when the guy held them up and he ran out, he said, "I ran out after him." He said, "He got away." I asked him, I said, "Did you go back and see the lady, to see if she got hurt? And he said, "No, he got away, 'so I didn't bother going back."

Detective Keahon testified that appellant was delivered to him at 5:20 P.M. His handcuffs were removed and he sat in a chair at Keahon's desk. Only one other police officer—engaged in other duties—was in the large Robbery Squad office, and there was no noise or other disturbance that might be distracting or interfere with hearing. After telling appellant of the warrant under which he had been arrested, Keahon read to appellant the P.D. 47 card, and also a P.D. 54 form which states the *Miranda* warnings and contains a consent to speak.[3] Both forms were given to appellant to read, which he did. He was asked if he understood the warnings, and replied that he did. He was asked specifically if he understood his right to have a lawyer; again the answer was positive, and appellant added that he didn't want a lawyer. It was further Keahon's testimony that:

> "I asked him if he knew that anything he said to us could be or would be used against him in court. And he stated that he did. He said, 'I know my rights.'"

Thereafter he signed the P.D. 54 consent form at 5:30 P.M.

Keahon testified that, as these procedures were completed, appellant broke in to say: "I want to clear Teddy. Teddy didn't shoot the woman in that hold-up; I did." This reference was to a robbery of a High's Ice Cream store. Thereafter appellant referred in quick succession to certain other robberies, including Mike's Carry-Out Shop and the Meridian Market. At some point in this colloquy Keahon decided that he should be taking notes of what was being said, and he reached for a pad and pencil. What

happened then is described in Keahon's testimony as follows:

A. I started to write. The defendant Frazier said, "No, don't put anything down." He said, "Don't write anything."

Q. How strenuous an objection was that, in your opinion?

A. Well, it wasn't—to me, it didn't seem like an objection. He just said, "Don't write." So, I didn't press it at that time.

Q. Why?

A. Well, he was admitting these hold-ups and I didn't want to start arguing with him as long as he was talking about hold-ups. And he was apparently being very truthful, because he was telling me things about the hold-ups that I didn't know. I didn't want to stop him.

So, as soon as he said, "Don't write," I stopped writing and pushed the pad and pencil away.

There is some confusion in the record as to whether this note-taking incident occurred before or after appellant had told of his participation in the robbery of the Meridian Market. The trial court was at some pains to get this matter cleared up, because Keahon appeared to be testifying on remand that it occurred after the Meridian Market admission, whereas his testimony at trial indicated it had been before. Keahon was asked to refresh his recollection during a recess; and his final testimony on this point is as follows:

Q. Lt. Keahon, during the noon recess did you have an opportunity to read from certain portions of the

---

3. P.D. 47 and P.D. 54 contain the same language of warning and advice of rights; and there is no issue raised as to the responsiveness of that language to the *Miranda* requirements. The warnings included these statements relevant to the issue which is raised on this appeal:

"You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions.

"Anything you say can be used against you in court.

"You have the right to talk to a lawyer for advice before we question you and have him with you during questioning.

"If you cannot afford a lawyer and want one, a lawyer will be provided for you."

original trial transcript in this regard?

A. Yes, sir.

Q. And has that refreshed your recollection as to the events which took place in the afternoon of September 6, 1966?

A. Yes, sir.

Q. September 7, excuse me.

Going back to those events, sir, will you tell us at what point in your interview with the defendant, Mr. Frazier, did he request that you not write anything down?

A. It was when he started mentioning the High Store hold-up, after he was advised of his rights and after I had read him the arrest warrant about the robbery-hold-up that he was charged with under the warrant of Mike's Carry-Out Shop.

Q. Well, after you read to him P.D. Form 47 and after he had executed the Form 54, what was the first topic of conversation?

A. Well, I started talking to him about the Mike's Carry-Out Shop hold-up.

Q. At that point had you reached for a pad and pencil?

A. No, not at that time.

Q. Had the defendant said anything to you about refraining from taking notes at that time?

A. No, not at that time.

Q. Tell us, then, just what happened?

A. Well, it was after that. I don't know the exact conversation, but I was talking to him about Mike's Carry-Out.

He did mention something about that afternoon. And then he started saying, "Well, I don't care," something to that effect, and he started into the High's Store hold-up, where he said Teddy was involved and Teddy didn't shoot the woman; "I shot the woman."

At that time was when I did reach for the pad and started to take notes.

At that time he stated he didn't want any notes taken. He said, "Don't write anything down," something to that effect.

THE COURT: Was this before he mentioned anything about the Meridian Market?

THE WITNESS: Yes, I believe it was.

Detective Keahon testified that, in all, appellant told of several hold-ups and of one occasion on which he had shot his roommate. The woman who had been shot in the High's Store robbery was brought down to the office, and appellant reenacted the incident in such a way that he convinced her that he was her assailant and not one Teddy Moore who was being held for that robbery. A victim of one of the other robberies recounted by appellant also identified him, aided by appellant's volunteered recital of the events of that robbery.

The interview ended around 7:30 P.M. Keahon testified that appellant had been not only cooperative but coherent, with no signs of emotional disturbance or physical discomfort of any kind. At the end, as indicated by Keahon's testimony set forth in the margin, appellant rejected a suggestion that he write out, or sign a written version, of what he had said.[4]

---

4. Q. Did you make a second effort to prepare the written statement about these events?

A. After he had finished and told us in the Robbery Squad Office, he finished and said, "That's it; that's all I know and that's all I'm going to tell you."

I asked him, I said, "Will you give us a statement in your own handwriting, or will you repeat what you have told me and I will put it in the form of a statement, in a typewritten statement, and would you sign it?"

He said, "No." He said, "I'm not going to sign anything."

Then I said, "Well, from what you have told me, I am going to write it up. Will you read it and sign it?"

And he said, "No, I'm not going to sign anything at all."

Keahon was present the next morning when appellant was taken before the United States Commissioner on the Mike's Carry-Out charge. Keahon testified—and the record of that proceeding recites—that, after full advice as to his rights, appellant "stated that he wanted a hearing now—that he wanted to get it over with and that he did not want a lawyer—of own choice or Legal Aid." Commissioner Wertleb testified that his notes of that appearance showed that appellant "stated affirmatively that he did not want any lawyer."

A third police witness presented by the Government was Officer Durkey. He testified that on March 23, 1966, he had arrested appellant on a charge of assault with a gun, and that he had then both read to appellant a P.D. 47 card and given him a copy of it to keep. Aside from saying that he had not been in possession of the gun, appellant made no further response to the giving of these warnings.

The Government's first witness at the remand hearing was Dr. Stammeyer, a clinical psychologist on the staff of St. Elizabeths. Testifying from the records compiled by St. Elizabeths at the time appellant was committed for a mental examination on December 8, 1966, in the Mike's Carry-Out case, Dr. Stammeyer testified that appellant was "a man of at least low average native abilities," or "possibly even somewhat higher." He said that there was "no indication of any significant impairment that would significantly interfere with his perception;" and no evidence was found of "any organic brain pathology or any acute emotional problems at that time, that would significantly interfere with his intellectual functioning." The warnings in P.D. 47 were read to the witness, and he stated his opinion to be that appellant unquestionably "could understand and appreciate and comprehend" their meaning.

On cross-examination, Dr. Stammeyer reported that, although he had agreed with the St. Elizabeths finding that appellant was competent to stand trial, he personally had not shared the view that appellant was without mental disorder. He characterized that disorder as a passive aggressive personality, contributed to by an unsatisfactory life pattern, perhaps due in some part to recurrent medical problems, including sickle cell anemia. Although pressed closely by defense counsel in the light of these disclosures to modify his earlier opinion as to appellant's ability to understand the warnings given him, Dr. Stammeyer's final conclusion was that "on the basis of what I know about this man, my reviewing the psychological examination and going over the record and having participated in the staff conference, I see no reason to believe that he could not fully comprehend, did not have the capability and competency to fully comprehend that statement read to him."

The defense offered no evidence at the remand hearing. Appellant's counsel stated on the record that he would place appellant on the stand if the inquiry could be limited to "what his mental attitude was at the time of the alleged confession and not go into the elements of the confession or the elements of the crime." The court indicated its doubt that such matters would be relevant in any event, but, even if they came out, the court represented its understanding of the law to be that such testimony could never be used against appellant in a trial of guilt or innocence. Although defense counsel appeared to accept this repre-

Q. Did he ever indicate that he did not want to tell you everything, though?
A. No, sir.
Q. Now, did there come a time that you reduced the substance of this conversation to writing?
A. Yes.
Q. When was that?

A. Well, I reduced some of it into writing that night before I went home. I was working the 8:00 A.M. to 4:00 tour of duty. I reduced it briefly into writing for the benefit of my superior, Inspector Sullivan, so that he would have a brief summary of what took place on his desk when he came into work in the morning.

sentation, after consulting with his client he reported that appellant did not desire to testify.

The District Court found as facts that appellant had adequately and repeatedly been exposed to the requisite *Miranda* warnings; he was not under the influence of alcohol or narcotics at the time of his arrest; the noise level in the Robbery Squad room was not such as to interfere with his capacity to hear; the warnings unmistakably gave notice that what one *says*, as distinct from what one *writes* or *signs*, can and will be used in court; appellant's mental abilities were such as to enable him to comprehend this meaning; and appellant was in no way subjected to involuntary or forced extraction of evidence.

The court characterized appellant's admissions as having "gushed out . . . after numerous warnings, apparently starting with an effort by [appellant] to clear a friend of his from a crime that . . . he committed and his friend had not, and then continued to these other crimes, which he, apparently, decided that once he had started, he might as well make a clean breast of." Under these circumstances, concluded the court, there could be no question of the knowing and intentional nature of appellant's purpose to forego rights available to him.

In the panel opinion ordering remand, it was said (at p. 1169 of 419 F.2d):

". . . Appellant's ban on note-taking inveighs against intelligent waiver, but this inference might be overcome, for example, if Sergeant Keahon admonished him that even an oral confession would be used against him, and appellant replied that he knew that but still did not want anything written down. *Absent some additional evidence, comparable in quality, of understanding waiver, however, his confession cannot stand . . .* " (Emphasis supplied.)

In his oral argument to the court for reversal at the close of the remand hearing, appellant's counsel contented himself with simply saying that, since there was no evidence adduced that Keahon had supplemented the written warnings in the manner referred to by the panel, the Government had "failed to carry the heavy burden the Court of Appeals has placed on its shoulders. . . ."[5]

The burden which the Government had to carry on remand was, however, one that was placed upon it by the Supreme Court in *Miranda*, and not by this court. As the Supreme Court put it, an arrested person must be adequately apprised that "anything said can and will be used against the individual in court." 384 U.S. at 469, 86 S.Ct. at 1625, 16 L.Ed.2d 694. And the Government's burden of proof includes, in addition to the fact of such a warning a showing—if the issue is raised—that the person warned was capable of understanding it.

There was no question in this case as to the fact of warning. The concern which prompted the panel to remand was capacity—the state of appellant's mind and understanding with respect to the terms of the warning. Its opinion indicated that there should be further evidence taken which would shed light on

5. This approach had been foreshadowed at the very beginning of the remand hearing. When Dr. Stammeyer was presented as a witness, appellant's counsel objected to his testifying on the ground that expert testimony as to the appellant's capacity to comprehend would be relevant only to a defense of not guilty by reason of insanity. The following colloquy between court and counsel is indicative of the fact that counsel apparently believed that the only purpose of the remand inquiry was to determine whether Sergeant Keahon had made a further admonition of the kind referred to by the panel and that, if the Government could not prove that he had, reversal must ensue:

THE COURT: You surely interpose the defense of being unable to comprehend or understand?

MR. O'MALLEY: I disagree.

THE COURT: If you do not, the Court of Appeals did.

MR. O'MALLEY: I would object to the introduction of this testimony.

THE COURT: I will admit it.

this question; and we, unlike appellant, do not read that opinion as saying that, unless Detective Keahon testified that he had elaborated on the language of the formal warnings by putting a legal gloss upon it, the Government must fail no matter what other evidence was forthcoming.

■ At the remand hearing, the Government addressed itself to this task. Its principal witness in this regard was Dr. Stammeyer, who testified as an expert witness on the precise question of whether appellant had the capacity to understand the meaning of the warnings as given. That testimony was unrebutted, and the District Court surely committed no error in finding from it that appellant possessed such capacity. But even where capacity exists, it is sometimes true that understanding can be faulty or mistaken. Although fully able to understand the plain words of the warning, it may have been that appellant, through some quirk of misinformation or otherwise, did not take them at their face value.

On this issue, of course, there was only one witness who could be useful— and this was appellant himself. It seems most unlikely that any member of the remanding panel thought other than that appellant would be a critically important witness on the remand hearing. In its opinion the panel majority was at some pains to remark that "[A]ppellant, of course, may wish to testify at that hearing," adding citations of Simmons v. United States, 390 U.S. 377, 389–394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and Bailey v. United States, 128 U.S. App.D.C. 354, 389 F.2d 305 (1967), for the obvious purpose of reassuring appellant that nothing he said in that testimony could be used against him to prove the commission of criminal offenses.

As it turned out, appellant chose not to testify, leaving the court with no direct evidence from appellant himself as to why he had asked that his statements not be noted down. Confronted with a similar situation in which an appellant failed to testify in a hearing on whether he had waived his *Miranda* rights after warning, United States v. Hayes, 385 F. 2d 375 (1967), cert. denied, 390 U.S. 1006, 88 S.Ct. 1250, 20 L.Ed.2d 106 (1968), the Fourth Circuit, speaking through Judge Sobeloff, said (at p. 378):

" . . . [Appellant] produced no witnesses putting in question his apparent intellectual endowments. Moreover, it is noteworthy that at no stage in the proceedings has the appellant ever denied that he understood the warnings given him, and while a defendant does not have the obligation to testify himself or to offer testimony, a court cannot supply evidence that is lacking . . . "

So here, appellant has never asserted that he misunderstood or misinterpreted the words of warning.[6] When given the

---

6. In United States v. McNeil, 140 U.S.App. D.C. 3, 433 F.2d 1109 (1969), the defendant testified at a pretrial suppression hearing that he had not, contrary to the arresting officer's testimony, been given the requisite *Miranda* warnings at the time of his arrest. Both the police officer and defendant also testified at that hearing that the latter, after arrival at the stationhouse, refused to sign a form acknowledging that he understood the warnings. At trial, counsel renewed the motion to suppress, asserting that defendant's refusal to sign the form indicated that he did not understand the warnings. The District Court's rejection of that argument was affirmed by this court upon appeal. In doing so, this court stressed the fact that appellant had testified at the pretrial suppression hearing, and that "the judge could accept at face value appellant's own testimony at the hearing that he did not sign the acknowledgement form, not for any stated reason that he did not understand the warnings, but simply because he was adverse to signing anything at all . . ." *See also* Pettyjohn v. United States, 136 U.S.App. D.C. 69, 419 F.2d 651 (1969), cert. denied, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed. 2d 676 (1970), where appellant's testimony that he had refused to sign anything was urged as establishing his lack of understanding of the warnings. This court was not persuaded by that contention.

opportunity to do so, under the protections of the remand hearing, he failed to take it. Contrarily, the evidence that was before the District Court supported a finding of his capacity to understand, as well as an absence of any coercive or confusing influences in his communications with the police. Under these circumstances, we do not see how the District Court can be faulted for its conclusion that the Government has sustained its burden of establishing a knowing and voluntary waiver.

In its consideration of the case after remand, a majority of the panel appeared to be of the view that, since Keahon failed to expand his testimony to include a statement that he had in fact explained to appellant that the legal rules governing the admissibility of evidence do not distinguish between oral and written confessions, there was, within the meaning of the remand opinion, no "additional evidence" relevant to waiver forthcoming. Further, the majority appears to have concluded that, absent such testimony, an element of coerciveness or at least unfair treatment by the police has entered the picture.

We think, contrarily, that Dr. Stammeyer's testimony was a highly significant and obviously relevant piece of "additional evidence," basing as it did a finding that appellant had the capacity to comprehend the warnings as they were given to him. That finding, certainly in the absence of testimony from appellant, remits to sheer speculation the reason why appellant spoke as he did with relation to note-taking. We do not think the District Court was required to speculate about it, nor do we. What is clear is that the interpretation which the panel majority insists in placing upon it is simply one of several speculative hypotheses which might be indulged in, by no means all of which are incompatible with a legally sufficient waiver.[7]

Neither do we think that this conviction should be reversed on any theory that appellant was so shabbily dealt with by the police that emanations from the Due Process Clause point towards that result. It appears clearly from the record that appellant had already confessed his most serious crime (the armed robbery of a High's Store in which he shot a female employee) before the note-taking episode occurred. From Detective Keahon's standpoint, the procession of admissions which began to follow were of primary interest as clearing the police records, but of secondary importance in terms of appellant's having voluntarily put himself in the toils of the law. Keahon's purpose in reaching for pencil and paper was, as he testified, simply to keep track of what was pouring from appellant's mouth on the heels of the High's Store confession. Had the interview been stopped when appellant objected to the note-taking, the utility of that confession would not have been affected. Thus, it does not seem to us that there can be any suggestion that Keahon was deliberately luring appellant into the deeper and more dangerous waters of criminal admissions. Appellant had already taken that plunge.

Moreover, we remind that one of the purposes of *Miranda* was to introduce into the post-arrest period more regularized procedures, eliminating the high degree of informality and variability which contributed heavily to the evils of stationhouse interrogation. Witness the care with which the Supreme Court spelled out the precise character of the words of warning to be given, and the wide extent to which law enforcement authorities have embodied such warnings *in haec verba* on printed cards to be used by arresting officers. We doubt that the warmest friends of *Miranda* wish to see a return to the days when such officers, although not lawyers

7. In *McNeil*, note 6 *supra*, this court said that "one can readily envision reasons for a declination to sign an acknowledgment of warnings that are entirely unre- lated to an understanding of the warnings." And see Judge Nichols's dissent in this case from the panel's decision after remand.

themselves, were free with legal advice to their prisoners.

It was not for Keahon to place a legal interpretation on the language of *Miranda* warnings he was directed to give, and to continue or to suspend the interview in accordance with what that interpretation might be. He had given the warnings as required; appellant had signified his understanding and his wish to talk without a lawyer present; appellant had indeed already confessed a most serious crime before he objected to Keahon's starting to take notes. We cannot see how, under these circumstances, Keahon's allowing appellant to pursue his evident desire to keep on talking was either an unreasonable or deceptive tactic on Keahon's part, falling short of those concepts of ordered liberty which are at the core of the concept of due process.

Wise administration of the waiver of the *Miranda* rule is, of course, of central importance to the continued health of the rule itself, which was promulgated upon the explicit premise that it could be validly waived.[8] When the police have, as here, faithfully followed the exact procedure prescribed by the Supreme Court, inferior courts should be slow to mandate, after the fact, enlarged responsibilities alien to the duties and the training of policemen. In any event, we see no basis in the record before us for overturning the District Court's resolution of the issue entrusted to it upon remand.

Affirmed.

BAZELON, Chief Judge (dissenting):

I dissent from the decision of the court today because it seems to me manifestly in error, but I am also concerned about the circumstances under which this decision has been rendered.

I

At issue in this case is the admissibility of certain statements made by Frazier during the course of police interrogation. It is undisputed that Frazier was advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to the onset of the interrogation. And it is also agreed that he signed a written statement waiving the protection of those rights. But as soon as the interrogating officer attempted to take written notes on Frazier's statements, Frazier refused to continue. However, when the officer ceased making contemporaneous notes, Frazier did make further statements. The confession at issue here was made during the latter period and involved a crime not discussed before the notetaking incident. The question in this case is whether, on the unusual facts presented, the government met its "heavy burden" of proving that the waiver was knowing and intelligent.

When the case first reached this court, a panel concluded that Frazier's unwillingness to have his statements recorded in writing may have signalled a mistaken assumption on his part that only written statements could be used against him. Frazier v. United States, 136 U.S.App.D.C. 180, 419 F.2d 1161 (1969). We therefore remanded the case to the trial court to afford the government an opportunity to meet its burden of showing a knowing and intelligent waiver by demonstrating, for example, that Frazier had been admonished that "even an oral confession would be used against him and [that he] replied that he knew that but still did not want anything written down." However, on remand, the police interrogator stated why he did not admonish Frazier:

"I didn't want to start arguing with [appellant] as long as he was talking

---

8. "Confessions," said the Supreme Court in *Miranda*, "remain a proper element in law enforcement;" and any statement "given freely and voluntarily without any com- pelling influences is, of course, admissible in evidence . . . ." P. 478 of 384 U.S., p. 1630 of 86 S.Ct.

about hold-ups. . . . [H]e was telling me things about hold-ups that I didn't know. I didn't want to stop him. So, as soon as he said, 'Don't write,' I stopped writing and pushed the pad away."

Thus the interrogator, with commendable candor, made absolutely clear that because he was aware of the appellant's misunderstanding he elected not to risk any clarification for fear appellant would stop talking. *Moreover, it is of critical importance that the trial court's findings did not indicate the court had even considered the significance of Frazier's ban on notetaking.* Accordingly, when the case returned to this court for the second time, we held that the government had not met its burden of proving that Frazier's statements were the product of a knowing and intelligent waiver, and we held the statements inadmissible.[1] It is that decision which has now been overturned by the court *en banc*.

The purpose of the *Miranda* warnings is to convey information to the suspect. Plainly, one who is told something he does not understand is no better off than one who is told nothing at all. Without full understanding, the warnings are simply a "preliminary ritual."[2] The majority today concedes that Frazier may not have understood the warnings before he made his confession. But the court finds, nonetheless, that the government can meet its burden—and has met it here—by offering proof that the warnings have been given and by making "a showing—if the issue is raised—that the person warned was capable of understanding" the warnings. Majority opinion at 896 *supra*.

Of course, the problem posed by this case would not exist if the warnings were so clear that no one possessing even minimal intelligence could possibly misunderstand them. But capacity to understand the warnings does not by any means guarantee that they will actually be understood. The available empirical evidence clearly indicates that many, if not most, defendants do not understand the warnings,[3] even where the defendants are intelligent and well educated.[4] The likelihood of under-

---

1. The panel opinion in this case is reproduced as an Appendix to this opinion.

2. Miranda v. Arizona, 384 U.S. 436, 476, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The authors of an extensive field study of the implementation of *Miranda* in *this* jurisdiction concluded:

   The ratings indicated that 15 per cent of the 85 "post-*Miranda* defendants" failed to understand the right to silence warning, 18 per cent failed to understand the warning of the right to presence of counsel, and 24 per cent failed to understand the warnings of the right to appointed counsel.

   Medalie, Zeitz & Alexander, Custodial Interrogation in Our Nation's Capital: The Attempt to Implement Miranda, 66 Mich.L.Rev. 1347, 1375 (1969). The authors also considered the possibility of methodological bias in their study. Their conclusion was that "if anything, our results underestimate the defendants' rate of misunderstanding of the warnings." *Id.* at 1374 n. 101. In another article based on the same data, different methods of analysis led to the same conclusion. Zeitz, Medalie & Alexander, Anomie,

Powerlessness and Police Interrogation, 60 J.Crim.L.C. & P.S. 314 (1969) ; *see* Note, Interrogations in New Haven: The Impact of Miranda, 76 Yale L.J. 1519 (1967).

4. The Supreme Court recently reversed the perjury conviction of a well-known movie producer arising from his unresponsive and misleading answer to a question about Swiss bank accounts. Chief Justice Burger, writing for a unanimous Court, observed that:

   [u]nder the *pressures* and *tensions* of interrogation, it is not uncommon for the most earnest of witnesses to give answers which are not entirely responsive. Sometimes a witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it. Bronston v. United States, 410 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).

   The Court went on to observe that where an interrogating lawyer is confronted with such a possible misunderstanding:

   . . . the examiner's awareness of unresponsiveness should lead . him to press another question or reframe his

standing is necessarily reduced where, as here, the 28-year old defendant has been afflicted with sickle cell anemia for many years and used narcotic drugs to mitigate his pain.[5]

That is not to say, however, that *Miranda* requires an inquiry in every case into the special capacity to understand the warnings. If that were the case, the government could validly contend that the panel decision "forces the police to become mind-readers and then blames them if they guess wrong." In fact, the government's contention rests on a complete misunderstanding of the panel opinion.

*Miranda* was designed as a prophylactic rule for the precise purpose of avoiding the morass into which the courts had previously slipped by attempting to judge, after the fact,—and from the inevitable swearing contest between the police and the accused as to what transpired [6]—the precise subjective state of mind of every defendant whose confession was challenged as involuntary. In the usual case a written waiver obtained without coercion after a full and accurate explanation of the meaning of the rights and the consequences of waiving them is sufficient to meet the government's burden regardless of any subsequent claim that the suspect did not understand what he was told. But where, at the time of the interrogation, the suspect says or does something sufficient to put a reasonable man on notice that the warnings may not have been understood even though a waiver was signed, the interrogation must stop until the matter has been clarified or all statements elicited thereafter will be inadmissible. The panel concluded that a reasonable police officer would have determined on the basis of Frazier's objective behavior that he may not have grasped the meaning of the warnings. Far from requiring the police officer to read Frazier's mind, our earlier decision required only that the officer clear up a possible misunderstanding that would have been apparent to any reasonable observer—as it was to the police interrogator here.

## II

That the court should today carve out a highly damaging exception to a fundamental principle of *Miranda* is disquieting enough. But the court's *en banc* decision here is disturbing in another regard. The panel decision in this case occasioned substantial, hostile comment in the news media. Plainly, widespread criticism of a decision is neither a cause for alarm nor a reason to insulate the decision from re-examination. What makes this case exceptional is that the

---

initial question with greater precision. *Id.*

The juxtaposition of that decision with this one might cause some confusion about the meaning of ·the principle "Equal justice under law". If the courts recognize the "pressures and tensions" on a prominent and prosperous professional man who is undergoing interrogation, they should be at least as solicitous when the person under interrogation is a poorly educated and downtrodden individual such as Frazier. If courts are going to require interrogators to display precision and caution in questioning Samuel Bronston, as a predicate to a perjury conviction, we should be at least as demanding of those questioning Eugene Frazier, as a precondition to a waiver of his constitutional rights.

I recognize that the danger of misunderstanding arises in different contexts in the two cases. But just as *Miranda* prohibits a judge from speculating about the validity of a waiver, so *Bronston* prohibits a jury from "conjecture". The central concern of both is the heavy responsibility imposed on the government when it seeks to use self-incriminatory information solicited from a defendant. The concern for the individual reflected in the *Bronston* opinion should be dispositive in this case as well.

5. This information appeared in a report submitted to the district court by St. Elizabeths Hospital on Feb. 8, 1967.

6. The Miranda rule leaves no room or occasion for choosing to believe either a defendant's naked assertion that he did not understand the warnings, or the interrogator's naked assertion that he believed the defendant had understood.

nation's highest law enforcement officer, the then Attorney General, saw fit to lash out publicly at the panel decision while the government's petition for rehearing *en banc* was pending before the court.[7] In a speech delivered to the National District Attorneys Association, the Attorney General singled it out as "Case No. 1" in his explanation of what he unfortunately sees as the "public's los[s of] confidence in the ability of the courts to dispense justice." I had understood that the Department of Justice's professed policy was, wisely, to refrain from comment on pending cases and to make its argument in court.[8] The Attorney General's deviation from that sensible rule clearly endangers the integrity of the judicial process.

In an appeal from a contempt conviction of a defense counsel for his public comments on a pending case, Mr. Justice Frankfurter issued the following warning:

If the prosecutor in this case had felt hampered by some of the rulings of the trial judge, and had assailed the judge for such rulings at a mass meeting, and a conviction had followed, . . . is it thinkable that this Court would have found that such conduct by the prosecutor was a constitutionally protected exercise of his freedom of speech, or, indeed, would have allowed the conviction to stand?

\* \* \* \* \* \*

The delicate scales of justice ought not to be willfully agitated from without by any of the participants responsible for the fair conduct of the trial.[9]

Circuit Judges J. SKELLY WRIGHT and SPOTTSWOOD W. ROBINSON, III, concur in Part I of this dissent and in the panel's majority opinion attached hereto as an appendix.

## APPENDIX

Opinions issued February 24, 1971, and vacated on September 24, 1971, by the Court *en banc*:

Before BAZELON, Chief Judge, and ROBINSON, Circuit Judge, and NICHOLS,\* Judge, United States Court of Claims.

BAZELON, Chief Judge:

The sole question before us is the admissibility of certain statements made by appellant Frazier to a police interrogator.[1] In an earlier appeal,[2] we found strong indications in the record that appellant did not "knowingly and intelligently" waive his constitutional privilege against self-incrimination, and consequently that his statements were inadmissible under Miranda v. Arizona.[3] Appellant had initially agreed to speak to the police interrogator, but he refused to continue if the officer took written notes. This refusal, we said, "inveighs

7. I do not suggest that any judge of this court was moved by the Attorney General's remark to vote for rehearing *en banc* or reversal on the merits. The vote for rehearing was completed on April 15, 1971, long before the Attorney General's speech on June 9, 1971. The order granting rehearing *en banc* was issued after the speech, however, and the case has been under consideration by this court since then. We cannot expect that our knowledge that we did not bow to external pressure is known either to the appellant or to the public. Therefore, that we did not bow does not make any less substantial the damage to the public confidence in the integrity of our decision-making process.

8. Since the Attorney General and his aides saw fit to refer to this case so critically and specifically, it must be presumed they were aware that the Department of Justice had filed a petition for rehearing that was still before the court.

9. In re Sawyer, 360 U.S. 622, 666–667, 79 S.Ct. 1376, 1398, 3 L.Ed.2d 1473 (1959) (Frankfurter, J., dissenting).

\* Sitting by designation pursuant to Title 28, U.S.Code, Section 293(a).

1. Appellant was convicted of robbing the Meridian Market, and sentenced to a term of 5 to 15 years, *see* D.C.Code § 22–2901.

2. Frazier v. United States, 136 U.S.App. D.C. 180, 419 F.2d 1161 (1969).

3. 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

against intelligent waiver," but we remanded for a hearing specifically to afford the Government an opportunity to present evidence that the waiver was valid. On remand, the District Judge found a valid waiver, but we disagree. We think it plain that the Government did not discharge the "heavy burden" imposed by *Miranda* of establishing that appellant knowingly and intelligently waived his fifth Amendment rights.

## I

At the remand hearing the Government introduced evidence showing the following facts.[4] Appellant was arrested about 4:15 on the afternoon of September 7, 1966, on a warrant for the robbery of Mike's Carry Out. Appellant was advised of his rights,[5] and taken to the Robbery Squad office, arriving, after processing, at about 5:20 p. m.

Detective Sergeant Keahon read the *Miranda* warnings to appellant[6] and gave him a copy of the warnings, which he read. The Sergeant then read to appellant a "Consent to Speak" form,[7] which appellant read and signed at 5:30 p. m. Appellant, a man of at least low average mentality, told the officer that he understood his rights and that he did not want a lawyer. He was not distracted in any way while being given the warnings.

Sergeant Keahon then started to ask appellant about the Mike's Carry Out robbery, but appellant interrupted him to admit a robbery and shooting at High's Market. According to the Sergeant, appellant said he was admitting this crime in order to clear another person who had already been charged with it. The officer reached for a pad and pencil to transcribe the confession. Appellant, however, said: "Don't write anything down. I will tell you about this but I don't want you to write anything down." Sergeant Keahon put down the pad and said nothing. Appellant continued his description of the High's Market episode, touched briefly on another crime, and then, about five minutes after he had barred transcription of his statements, admitted the Meridian Market robbery, the crime which underlies this conviction. A little while later appellant re-enacted the High's Market robbery for the benefit of sever-

---

4. Appellant offered no evidence at the remand hearing. Appellant's failure to testify may have been the result of confusion on the part of appellant and his counsel about the use that could be made of his testimony, although we had indicated on the prior appeal that the rules of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) and Bailey v. United States, 128 U.S.App. D.C. 354, 389 F.2d 305 (1967), would protect appellant if he did take the stand, Frazier v. United States, *supra* note 2, 136 U.S.App.D.C. at 188 n. 36, 419 F.2d at 1169 n. 36.

   After the Government rested its case, appellant's counsel (not his counsel on appeal) said:

   > If we could limit the inquiry to what his mental condition was at the time of the alleged confession and not go into the elements of the confession or elements of the crime, I would place the defendant on the stand.

   The court then gave its view of the probable scope of examination, concluding that even "if something does come out about [criminal activity], [it] would not be admissible in other cases anyway." Defense counsel replied: "I am not prepared to accept that." The colloquy continued and then, after conferring with appellant several times, defense counsel announced: "Your Honor, I have counseled with the defendant and he at this time does not desire to take the stand."

5. A police officer testified that when he gave appellant these warnings, appellant said: "You didn't have to read it to me in the first place. I already know my rights." Appellant had been given a copy of the warning form used by police, see note 6, *infra*, when he had been arrested in March 1966 for another offense, see note 19, *infra*.

6. The Police Department Form 47 read to appellant is printed in Pettyjohn v. United States, 136 U.S.App.D.C. 69, 70 n. 3, 419 F.2d 651, 652 n. 3 (1969), cert. denied, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970).

7. The Police Department Form 54 which appellant read and signed is printed in Pettyjohn v. United States, *supra* note 6 at 71 n. 4, 419 F.2d at 653 n. 4.

al witnesses who were unable to identify him by sight. The questioning ended at about 7:30 p. m. when appellant said: "That's it; that's all I know and that's all I am going to tell you." Sergeant Keahon then asked appellant to write out a statement himself or to sign a typewritten summary of his confession. Appellant refused, saying: "No, I'm not going to sign anything." He was then taken to his cell. Throughout the entire investigation appellant cooperated with the police and was treated with courtesy by them.

## II

The trial court concluded that the Government carried its "heavy burden" of establishing that appellant validly waived his privilege against self-incrimination. Since that conclusion was based on the uncontroverted facts in the record, and not on an assessment of the credibility of witnesses, it is settled that we are in as good a position as the District Judge to determine the effect of that evidence.[8] It is highly significant in this connection that the District Judge gave no express consideration to the effect of appellant's refusal to per-

mit his statements to be reduced to writing, despite our emphasis on the point in our prior opinion. In our view, the evidence introduced by the Government cannot support the conclusion that appellant knowingly and intelligently waived his Fifth Amendment rights.

*Miranda* teaches that after the warnings have been given, "the accused is entitled to the assistance of counsel before he is questioned and, in effect, that any confession he makes while in exclusive police custody prior to arraignment is presumptively inadmissible . . . ."[9] When the police continue to question a suspect in the absence of counsel a confession "can stand if, but only if, the accused *affirmatively* and *understandingly* waives his rights."[10] In order for a waiver to be effective, the accused must realize the consequences of his act—in particular he must understand that anything he says can and will be used against him in court. "It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege."[11] Furthermore, "a heavy burden rests on the government to demonstrate that the defendant

---

8. *See, e. g.,* Judd v. United States, 89 U.S. App.D.C. 64, 67, 190 F.2d 649, 652 (1951) ("The real issue is whether the evidence offered by the Government, taken at full value, meets the required standard."); Weed v. United States, 340 F.2d 827 (10th Cir. 1965). *See also* E. F. Drew & Co. v. Reinhard, 170 F.2d 679, 684 (2d Cir. 1948); Dollar v. Land, 87 U.S.App. D.C. 214, 217–218, 184 F.2d 245, 248–249, cert. denied, 340 U.S. 884, 71 S.Ct. 198, 95 L.Ed. 641 (1950); United States v. Ziemer, 291 F.2d 100, 103–105 (7th Cir.), cert. denied, 368 U.S. 877, 82 S.Ct. 120, 7 L.Ed.2d 78 (1961) (Hastings, C. J., dissenting); Wabash Corp. v. Ross Electric Corp., 187 F.2d 577, 598–603 (2d Cir.), cert. denied, 342 U.S. 820, 72 S.Ct. 38, 96 L.Ed. 620 (1951) (Frank, J., concurring and dissenting). *But cf. e. g.,* Maxwell v. Stephens, 348 F.2d 325, 336 (8th Cir), cert. denied, 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965).

9. Frazier v. United States, *supra* note 2, 136 U.S.App.D.C. at 185, 419 F.2d at 1166. The Supreme Court said in

*Miranda, supra* note 3 at 469 of 436 U.S., at 1625 of 86 S.Ct.:

The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensible to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights.

10. Frazier v. United States, *supra* note 2, 136 U.S.App.D.C. at 185, 419 F.2d at 1166 (emphasis added).

11. Miranda v. Arizona, *supra* note 3 at 469, of 436 U.S., at 1625 of 86 S.Ct.

knowingly and intelligently waived his privilege against self-incrimination."[12] A determination whether the accused made a valid waiver requires the court to examine "the particular facts and circumstances surrounding [the] case,"[13]

We said in the prior appeal that appellant's ban on note-taking creates "[t]he strong implication . . . that appellant thought his confession could not be used against him so long as nothing was committed to writing."[14] We said that this implication

> might be overcome, for example, [by evidence that] Sergeant Keahon admonished [appellant] that even an oral confession would be used against him, and [that] appellant replied that he knew that but still did not want anything written down.[15]

But we added:[16]

> Absent some additional evidence, comparable in quality, of understanding waiver, however, his confession cannot stand.

No such evidence was forthcoming. The record makes it crystal clear that the officers failed to correct appellant's apparent misunderstanding—by explaining to him that an oral confession was as damaging as a written one—because they were afraid he would stop talking.[17] Sergeant Keahon stated with commendable candor that

> I didn't want to start arguing with [appellant] as long as he was talking about hold-ups. . . . [H]e was telling me things about hold-ups that I didn't know. I didn't want to stop him. So, as soon as he said, "Don't write," I stopped writing and pushed the pad away.

The Government says that it discharged its "heavy burden" by evidence that appellant was not interrogated in an oppressive manner nor subjected to physical or psychological coercion; and that he was given the warnings several times, said he understood them, and had sufficient mental capacity to understand them. Absent appellant's ban on note-taking "[t]here [would indeed be] nothing in the surrounding circumstances peculiarly susceptible to the interpretation that appellant misapprehended what the officers said he was told."[18] But appellant attached a peculiar condition to his consent to speak, a condition that should have alerted the officers to the possibility of a misunderstanding. He may well have thought that the Government could make no use of an oral statement in court, and there is no evidence that he was otherwise informed by the officers, by prior experience,[19] by education, or otherwise.

The Government contends that appellant's ban on note-taking does not necessarily mean that appellant failed to understand the consequences of an oral confession. Appellant, says the Government, "may have reasoned that if he ever decided to recant his decision to talk, he could . . . deny he said anything [,] and it would then be his word against that of the police [in court]."[20] At best, however, this speculation fits the facts only as well as any number of conceivable explanations. For example, appellant might have thought that by barring transcription of

---

12. *Id.* at 475, 86 S.Ct. at 1628.

13. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

14. Frazier v. United States, *supra* note 2, 136 U.S.App.D.C. at 187, 419 F.2d at 1168.

15. *Id.* at 188, 419 F.2d at 1169.

16. *Id.*

17. *Compare* United States v. Nielsen, 392 F.2d 849, 853 (7th Cir. 1968).

18. Pettyjohn v. United States, *supra* note 6, 136 U.S.App.D.C. at 76, 419 F.2d at 658 (Robinson, J., concurring) (footnote omitted).

19. That appellant had previously been arrested in March 1966 and made only an exculpatory statement does not demonstrate that he knew that an oral confession could be used against him in court.

20. Brief for Appellee at 9–10 (footnote omitted).

his statements he could clear a friend who had been charged with a crime [21] while at the same time preventing the police from using his confession against him. In any event, this sort of speculation cannot meet the Government's burden—established by ruling case law as well as the law of this case as set down on the prior appeal—of rebutting with affirmative and convincing evidence the inference that appellant did not validly waive his Fifth Amendment privilege.[22]

### III

The plain rule of *Miranda* requires us to reverse this conviction. The Supreme Court has often stated that a waiver of the right against self-incrimination is ineffective if there is any doubt that it was made with full understanding of the consequences.[23] Since there is ample reason to doubt appellant's understanding here, it was improper for the police officers to receive his statement, and error for the trial court to admit it.

It is not our role to question the plain teaching of *Miranda*. But were we to do so, we would be compelled to conclude that the *Miranda* rule reflects a principle fundamental to a democratic society. The Fifth Amendment protects *all* persons; it ensures that no individual need incriminate himself "unless he chooses to speak in the unfettered exercise of his own will." [24] *Miranda* is designed to make that protection meaningful for the man who has neither the education, the experience, nor the counsel that would enable him to make an informed decision. Far from being a mere technicality, it touches the heart of a system of justice that purports to treat all of its citizens equally under the law.

If we were to uphold this confession, then *Miranda* would indeed become "a preliminary ritual." [25] For the forms of *Miranda* were satisfied here: the officer read the warnings, and the suspect purported to waive his rights. But *Miranda* requires more of the interrogating officers. It requires them not only to recite the warnings, but also to be certain before questioning the accused that he understands his rights, realizes the consequences of speaking, and intelligently and voluntarily waives his privilege of silence.[26] Where the police officers are dealing with ill-educated and uncounselled suspects, they have a special obligation to be alert for signs of misunderstanding or confusion. Here the officers had ample reason to doubt that the accused understood the warnings. Yet they took no further steps—such as admonishing appellant that even an oral confession would be used against him in court, or halting the questioning until a lawyer could be obtained—to bring the warnings home to him in terms he could clearly comprehend.

---

21. See page 893, *supra.*

22. Appellant's refusal to speak if the officer took notes distinguishes this case from Pettyjohn v. United States, *supra* note 6, and United States v. McNeil, 140 U.S. App.D.C. 3, 433 F.2d 1109 (1969). In *Pettyjohn* the only indication of misunderstanding was the appellant's refusal to sign a typewritten statement *after* the confession had been made. The *Pettyjohn* court specifically distinguished that case from Frazier's on this ground, 136 U.S. App.D.C. at 73, 419 F.2d at 655. Similarly in *McNeil* the only indication of misunderstanding was the appellant's refusal to sign a form acknowledging that he understood the warnings, again after the confession had been made. The inference from this refusal that McNeil had misunderstood the warnings was negated by appellant's own testimony that he simply "wouldn't sign nothing," 140 U.S. App.D.C. at 7, 433 F.2d at 1113 n. 23.

23. Miranda v. Arizona, *supra* note 3 at 475 of 436 U.S., 86 S.Ct. 1602, 16 L.Ed. 2d 694; *cf.* Blackburn v. Alabama, 361 U.S, 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). *See also* Johnson v. Zerbst, *supra* note 13; Glasser v. United States, 315 U.S. 60, 70–71, 62 S.Ct. 457, 86 L. Ed. 680 (1942).

24. Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

25. Miranda v. Arizona, *supra* note 3 at 476 of 436 U.S., 86 S.Ct. 1602.

26. *See* Frazier v. United States, *supra* note 2, 136 U.S.App.D.C. at 185 n. 24, 419 F.2d at 1166 n. 24.

We recognize that we are vulnerable to the old criticism that criminals should not *go free for the constable's blunder.*[27] But the error involved in this case is no ordinary blunder. It is an egregious failure to observe a basic constitutional requirement. When we are ready to overlook errors of this type, we will have abandoned once and for all the effort to extend the same quality of justice to all persons, the ignorant as well as the educated, the poor as well as the rich.

Reversed.

---

27. *See* People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (Cardozo, J.). For an empirical study which concludes that the letter and spirit of *Miranda* are often violated in this jurisdiction, see Medalie, Zeitz & Alexander, Custodial Interrogation in Our Nation's Capital: The Attempt to Implement Miranda, 66 Mich. L.Rev. 1347, 1394 (1968).